WASHINGTON SPEAKERS BUREAU,
INC., Plaintiff,

v.

LEADING AUTHORITIES,
INC., Defendant.

No. 98–634–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 2, 1999.

**490**

William H. Bode, Daniel E. Cohen, Bode & Beckman, LLP, Washington, DC, for plaintiff.

Stephen A. Horvath, Trichilo, Bancroft, McGavin, Horvath & Judkins, P.C., Fairfax, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this suit, an owner of a recognized, but unregistered, trademark sues a competitor for trademark infringement and dilution based on the competitor's registration and use of a substantial portion of the trademark as a domain name. More particularly, plaintiff Washington Speakers Bureau, Inc., the owner of the unregistered mark "Washington Speakers Bureau," brings this federal trademark infringement and dilution action against its competitor, Leading Authorities, Inc., based upon Leading Authorities' registration and use of the domain names *www.washingtonspeakers.com, www.washington-speakers.com, www.washingtonspeakers.net, and www.washington-speakers.net.*

Set forth here are the Court's findings of fact and conclusions of law pursuant to Rule 52(c), Fed.R.Civ.P., as the parties have submitted the case on the discovery record for decision by the Court without a jury.

## I. FACTUAL BACKGROUND

Founded in 1980, Washington Speakers Bureau, Inc., (WSB) is a prominent lecture agency based in Alexandria, Virginia. WSB represents many well-known speakers such as Margaret Thatcher, Colin Powell, and Lee Iacocca exclusively and many other speakers non-exclusively. Over the years, WSB has received considerable press attention in connection with its representation of Ronald and Nancy Reagan, Norman Schwarzkopf, and other famous and sought-after speakers. The speakers WSB represents lecture to audiences around the world in a variety of corporate, trade, and educational fora.

The deposition testimony of WSB founders Bernie Swain and Harry Rhoads establishes that they chose the name "Washington Speakers Bureau" to indicate the general nature and location of their business. Their testimony also establishes that WSB has used the name "Washington Speakers Bureau" continuously for the past eighteen years.[1] During that time, WSB has expended considerable money and effort promoting and advertising its services under this mark, including over $1 million in advertising expenses in the past five years alone.[2]

Indeed, the record reflects that WSB regularly advertises its services and trademark to over 14,000 customers and prospective customers including trade association executives, corporate executives, college and university officials, and independent promoters. Also clear from the record is that WSB publishes and distributes advertisements, quarterly newsletters, and a comprehensive annual brochure under its trademark. Mark French, Leading Authorities' president, acknowledged in his declaration that he receives advertisements and literature from WSB almost daily. Samples of these advertisements, included in the record, confirm WSB's prominent and ubiquitous use of the trademark "Washington Speakers Bureau."

The record confirms that, in part because of its promotional efforts, WSB has developed substantial recognition of its trademark in the relevant consumer market. Particu-

---

1. "Washington Speakers Bureau" is technically a trade name that is also used as a trademark or service mark. In any case, protection of a trade name is based on the same legal principles that guide protection of trademarks, and § 43(a) of the Lanham Act can be used as a vehicle to assert infringement of a trade name. *See gener-* *ally 1 McCarthy on Trademarks and Unfair Competition* § 9.01 (4th ed.1996).

2. The exact amount spent by WSB in advertising expenditures appears in the sealed declaration of Renate Thompson, Chief Financial Officer for WSB.

larly persuasive in this regard are the affidavits submitted by various speakers' bureau consumers and competitors, as well as evidence of favorable press coverage. This evidence suggests that within that segment of society conversant with the world of high-profile business and political speakers, the name "Washington Speakers Bureau" is widely known and understood to refer to WSB. Nevertheless, WSB has not registered "Washington Speakers Bureau" as a trademark, although since bringing suit against Leading Authorities, WSB has commenced the trademark registration process, which is currently ongoing.

The record also discloses that "Washington Speakers Bureau" is not the only trademark associated with WSB in the market. Various affidavits of speakers' bureau customers indicate that, as a result of WSB's prominent position in the industry, some undetermined portion of the relevant market also understands the shorter phrase "Washington Speakers" to refer to WSB, although the deposition testimony of Messrs. Swain and Rhoads establishes that WSB has never called itself "Washington Speakers" in its own advertisements, publicity, or other official communications. Also, the extensive collection of newspaper and magazine articles entered into the record demonstrate that no media coverage of WSB's activities has ever referred to WSB as "Washington Speakers." Perhaps as a result, some portion of the relevant market aware of the activities of WSB does not understand the phrase "Washington Speakers" to refer to WSB, as demonstrated by affidavits offered by the defendant.

From the deposition testimony of Leading Authorities' president, it appears that Leading Authorities' business involves aiding associations, companies, and colleges in staging meetings using outside speakers that include various Washington and political personalities. In this connection, Leading Authorities offers a catalog and database listing hundreds of speakers. Leading Authorities was incorporated in 1990 and began its use of the name "Leading Authorities" in 1993. Rather than exclusively representing speakers, Leading Authorities typically "co-brokers" with other speaker groups or agencies to arrange speaker appearances. Indeed Leading Authorities has co-brokered speaking events with WSB on a number of occasions in the past. In addition to its typical mode of doing business, Leading Authorities also represents a handful of speakers exclusively. The record reflects that speakers co-brokered or represented by Leading Authorities lecture in the same fora as do speakers represented by WSB. In short, Leading Authorities transacts business in the same relevant market as WSB and offers similar, although not always identical, services.

The deposition testimony of Mr. French and David Blevins, Leading Authorities' systems administrator, in combination with the registration records of Network Solutions, Inc., (NSI)[3] establish that on or about March, 1998, Leading Authorities applied for the registration of domain names[4] *www.washingtonspeakers.com*, *www.washington-speakers.com*, *www.washingtonspeakers.net, and www.washington-speakers.net.*

A company may register multiple domain names, just as one individual may have multi-

---

**3.** Domain names ending in ".com," ".net," or ".org," among others, are registered through NSI on a first-come-first-served basis. Anyone may register any unused domain name upon payment of a fee. Of course, this registration in no way trumps federal trademark law; registration of a mark or name with NSI does not itself confer any federal trademark rights on the registrant. *See Cardservice Int'l, Inc. v. McGee,* 950 F.Supp. 737, 740 (E.D.Va.1997), *aff'd* 129 F.3d 1258 (4th Cir.1997); *see generally 3 McCarthy on Trademarks and Unfair Competition,* § 25:73 (4th ed. 1996 & Supp.1998).

**4.** Domain names are names identifying and accessing particular websites on the Internet.

They are, in effect, the addresses for websites, which are computer data files that can include names, words, messages, pictures, sounds, and links to other information. Use of a domain name takes an Internet user directly to the particular website associated with that domain name. Often domain names consist of some memorable or intuitive name or phrase related to the content of the website. In many instances, the domain name of a corporate website will consist of or incorporate the company's name or trademark. Such domain names can be valuable to a company because a domain name is the most direct way of locating a website.

ple phone numbers or addresses. These domain names may point to the same site, different sites, or different pages[5] of the same website. According to the deposition testimony of both Mr. Blevins and Mr. French, Leading Authorities concluded in early 1998 that use of multiple domain names would allow it to reach more people through the Internet, potentially generating more business for Leading Authorities, as well as giving existing customers easier access to Leading Authorities' website's resources. According to this testimony, Leading Authorities planned ultimately to have particular domain names point at specialized pages on its website. For example, a user typing in *orlandospeakers.com* would reach a Leading Authorities webpage with a special focus on Orlando, Florida, and the services Leading Authorities offered there. This page would also provide a link to Leading Authorities' primary webpage or pages. Mr. French and Mr. Blevins testified that they believed that such specialized pages and domain names would allow Leading Authorities to provide its customers more individualized service. Until the specialized pages were created, all the domain names would point at Leading Authorities' primary webpages. The record invites the inference that Leading Authorities believed that even in the absence of specialized pages, the use of multiple domain names would increase the potential use of its website by increasing the odds that an Internet user searching for speakers would likely type in a domain name leading to Leading Authorities' website.

In March, 1998, various Leading Authorities employees brainstormed domain names, creating lists of possible names for registration, several of which appear in the record. Thus, on March 20, 1998, Leading Authorities registered multiple domain names with NSI. These domain names all described in some fashion the services offered by Leading Authorities. Some made use of geographic place names.[6] Others described speakers by their areas of expertise.[7] Yet others described in relatively generic or laudatory terms the speakers or services offered by Leading Authorities.[8] Also at this time, Leading Authorities registered the domain name *leading-authorities.com.*

In the weeks following this initial, multi-domain name registration, Leading Authorities registered even more domain names. Again, some used geographic locations.[9] Others were variations on a toll-free "speakers" telephone number[10] or plays on Leading Authorities, Inc.'s "LAI" acronym.[11] Leading Authorities also registered two domain names incorporating the word "Blanchard" with the permission of Blanchard Training and Development, Inc., an organization that provides speakers to multiple speakers' bu-

---

5. A webpage is a particular screen or "page" that may be accessed at a website that typically consists of multiple screens or "pages."

6. These domain names included *floridaspeakers.com, orlandomeetings.com, californiaspeakers.com, californiaspkrs.com, californiameetings.com, europeanspeakers.com, worldmeetings.com, usmeetings.com, washingtonmeetings.com, national-speakers.com, internationalspeaker.com, chicagospeakers.com, chicagospkrs.com, americanspeakers.com, arizonameetings.com, worldspeakers.com, orlandospeakers.com, londonspeakers.com, northamericanspkrs.com, englishspeakers.com, washingtonspeakers.com, washingtonspkrs.com, and washington-speakers.com.*

7. These domain names included *salesspeakers.com, sportsspeakers .com, businessspeakers.com, minorityspeakers.com, politicalspeakers.com, capitolspeakers.com, milleniumspeakers.com, and mediaspeakers.com.*

8. These domain names included *celebrity-speakers.com, guestspeakers.com, famousspeakers.com, lectureagency.com, leadingspeakers.com, talentbureau.com, topspeakers.com, keynote-speakers.com,* and *professionalspkrs.com.*

9. These included *washington-speakers.net, usspeakers.com, canadaspeakers.com, canadianspeakers.com, newyorkspeakers.com, americanspeakers.com, americanspeakers.net, chicagospeakers.net, texasspeakers.com, texas-speakers.com, nashville-speakers.com, nashvillespeakers.com, sanfranciscospeakers.com, sandiegospeakers.com, atlantaspeakers.com, georgiaspeakers.com, capital-speakers.com, usaspeakers.com, washingtonmeetings.net,* and *nyspeakers.com.*

10. These included *1800speaker.com, 1888speakers.com, 1877speakers.com, 1888speaker.com, 1888speaker.net,* and *1800speaker.net.*

11. These included *laionline.com, lai-online.com,* and *laientertainment.com.*

reaus and lecture agencies.[12] In addition, Leading Authorities registered for a variety of other miscellaneous domain names.[13] Significantly, several of the domain names Leading Authorities registered during this period bore close resemblance to the names of other speakers' bureaus and lecture agencies around the world,[14] such as Keynote Speakers, Inc.; Capital Speakers, Inc.; Florida Speakers Bureau; Celebrity Speakers, Inc.; National Speakers Forum; National Speakers Bureau (located in America); National Speakers Bureau (located in Canada); National Speakers Association; International Speakers Bureau; Meeting Professionals International, Empire Entertainment; and American Speakers Bureau.[15] At least some of these organizations are prominent and well-known in the industry and were surely known to Leading Authorities' officials at the time of registration.[16]

In the spring of 1998, WSB attempted to register the domain name *washingtonspeakers.com* and found that it had already been registered by Leading Authorities. At this time, Mr. Rhoads contacted Mr. French to discuss the issue. Mr. French stated his belief that the phrase "Washington speakers" was generic and that Leading Authorities had a right to use the term as a domain name, although he nevertheless agreed to consider transferring ownership of the various *washingtonspeakers* domain names to WSB. A short time later, Mr. French informed Mr. Rhoads by letter that Leading Authorities would not surrender the *washingtonspeakers* domain names because the potential loss of revenue would be too great. Shortly after this communication, WSB instituted the instant action. Once served, Leading Authorities voluntarily suspended its use of the *washingtonspeakers* domain names, except for a brief period of two weeks or less when these domain names were accidentally switched on during Leading Authorities' transfer of its website from one Internet provider to another.

Initially, this action included allegations of common law unfair competition, common law trademark infringement, and common law "palming off," as well as trademark infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and trademark dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), WSB has since dropped the common law claims. Only the federal trademark infringement and dilution claims remain for disposition.

## II. Trademark Infringement

■ To prevail under § 43(a) of the Lanham Act, a plaintiff must show that it has "a valid, protectible trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon v. Alpha of Va.*, 43 F.3d 922, 930 (4th Cir.1995). As noted above, WSB has only

---

12. These were *blanchard-speakers.net* and *blanchard-speakers.com*. Later correspondence introduced into the record indicates that Blanchard Training and Development may soon revoke permission to use these names.

13. These domain names included *empirespeakers.com*, *speakers-online.com*, *online-speakers.com*, *speakers-bureau.net*, *speakersdirect.com*, *college-speakers.com*, *collegespeakers.com*, *businessspeakers.net*, *meetingprofessionals.com*, *celebrityspeaker.net*, *capitolspeaker.net*, *campusspeakers.com*, and *politicalspeakers.net*.

14. The existence of these organizations was established through the testimony of representatives of WSB and Leading Authorities.

15. The domain names that arguably duplicate the competitors' names, in addition to the names challenged in the instant suit, include *keynotespeakers.com*, *capitolspeakers.com*, *capitolspeaker.net*, *capital-speakers.com*, *floridaspeakers.com*,

*celebrityspeaker.net*, *celebrity-speakers.com*, *national-speakers.com*, *internationalspeaker.com*, *meetingprofessionals.com*, *empirespeakers.com*, *americanspeakers.com*, *american-speakers.com*, and *americanspeakers.net*.

The *blanchard-speakers* domain names are of course also similar to Blanchard Training and Development, Inc., but these names were registered with permission of the Blanchard organization.

16. An exception may be Florida Speakers Bureau. According to the testimony of Mr. French, no one at Leading Authorities was aware of the existence of Florida Speakers Bureau prior to Leading Authorities' registration of the similar domain name *floridaspeakers.com*. In most instances, however, deposition testimony suggests that at least some of those choosing domain names for Leading Authorities were aware of the similarly named competitors at the time the domain names were chosen.

recently initiated the process of registering "Washington Speakers Bureau" as its trademark.[17] Nevertheless, § 43(a) of the Lanham Act "generally has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered." *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 124 (4th Cir.1990). Since "Washington Speakers Bureau" is not a registered trademark, however, WSB has the burden of showing that it is entitled to the protection of § 43(a) of the Lanham Act. *See, e.g., Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998); *Blinded Veterans, Ass'n v. Blinded Am. Veterans Found.,* 872 F.2d 1035, 1041 (D.C.Cir.1989). To meet this burden, WSB must show that "Washington Speakers Bureau" constitutes a valid, protectible trademark and that the *"washington-speakers"* domain names are colorable imitations of the "Washington Speakers Bureau" trademark likely to cause consumer confusion. *See Lone Star Steakhouse,* 43 F.3d at 930.

## A. Distinctiveness of the "Washington Speakers Bureau" Mark

The degree of protection a trademark receives "is directly related to the mark's distinctiveness." *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 464 (4th Cir.1996). Courts applying § 43(a) have categorized marks as "fanciful," "arbitrary," "suggestive," "descriptive," or "generic," in descending order of strength. *See id.; Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984). The stronger the mark, the greater the degree of protection afforded by law. *See Larsen v. Terk Techs. Corp.,* 151 F.3d 140, 148 (4th Cir.1998). But there are no bright line demarcations between these categories; they are, instead, "like colors in a spectrum, [that] tend to blur at the edges and merge together, making it difficult to apply the appropriate label." *Dayton Progress Corp. v. Lane Punch Corp.,* 917 F.2d 836, 839 (4th Cir.1990).

"Fanciful" marks are usually coined words expressly designed to serve as a trademark, such as "Kodak" or "Exxon." *See Larsen,* 151 F.3d at 148 n. 5; *Sara Lee,* 81 F.3d at 464; "Arbitrary" marks are generally real words in common usage that do not describe any quality or characteristic of the products with which they are associated, such as "Apple" computers. *See Larsen,* 151 F.3d at 148 n. 5; *Sara Lee,* 81 F.3d at 464. "Suggestive" marks connote, but do not describe, some quality, ingredient, or characteristic of the product, such as "Coppertone" suntan lotion. These marks are not descriptive in that a person without actual knowledge of the product involved would not likely surmise what product a suggestive mark represents. *See id.; Pizzeria Uno,* 747 F.2d at 1528. These three categories of marks merit the highest level of trademark protection; when a mark is shown to be fanciful, arbitrary, or suggestive, its distinctiveness is presumed without further showing.

"Descriptive" marks, on the other hand, are not inherently distinctive, but "merely describe a function, use, characteristic, size, or intended purpose of the product." *Sara Lee,* 81 F.3d at 464; *see also Dayton Progress Corp.,* 917 F.2d at 839; *Pizzeria Uno,* 747 F.2d at 1528. Examples of such descriptive marks include "After Tan" post-tanning lotion, "5 Minute" glue, and the "Yellow Pages" telephone directory. *See Larsen,* 151 F.3d at 148, n. 6. Descriptive marks are the weakest category of protectible marks; they are not accorded trademark protection unless they have acquired "secondary meaning." *Id.* at 148. A mark has secondary meaning when "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Dayton Progress Corp.,* 917 F.2d at 839; *see also Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.,* 148 F.3d 417, 421 (4th Cir.1998). A "generic" mark is simply the name of the good or product itself and as such cannot ever receive trademark protection. *See id.* Examples of such generic brand names are Convenient Store retail stores, Dry Ice solid carbon dioxide, and

17. Specifically, WSB seeks to register the marks "Washington Speakers Bureau," "Washington Speakers Bureau, Inc.," and "WSB."

Light Beer beverages. *See Sara Lee,* 81 F.3d at 464; *Larsen,* 151 F.3d at 148 n. 5. Generic marks receive no trademark protection because "no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

■ WSB correctly makes no claim that "Washington Speakers Bureau" is a fanciful or arbitrary mark. Instead, WSB claims that "Washington Speakers Bureau" is suggestive, rather than descriptive or generic, because WSB does not merely represent speakers that live or speak in the Washington area, but rather represents a variety of persons with expertise in politics, government, and public affairs, who may live and speak anywhere in the world. Thus, WSB contends, a person hearing the phrase "Washington Speakers Bureau" would not likely surmise the actual product or service provided by WSB. This contention is unpersuasive. The word "Washington" has more than geographic meaning; it also suggests politics, public affairs, and power, and these connotations would likely occur to anyone hearing the phrase "Washington Speakers Bureau," whether or not the listener was aware of the specific nature of WSB's services.[18] Ordinary consumers understand "Washington" as a sort of shorthand for government and politics in general, and they may be expected to surmise that some speakers represented by Washington Speakers Bureau might be political figures who did not

actually work or live in Washington, D .C. Where, as here, a mark operates to describe a product or service in a manner readily understandable to the consumer, it is not suggestive. *See generally Pizzeria Uno,* 747 F.2d at 1528.

■ Therefore, "Washington Speakers Bureau" is either a descriptive or generic mark. If it is a generic mark, it cannot receive trademark protection. If it is a descriptive mark, it merits protection only if it has secondary meaning. While the two categories may blur at the margins, the Fourth Circuit has provided the following helpful distinction between generic and descriptive marks:

> A generic term ... conveys information with respect to the nature or class of an article. A descriptive term ... identifies the characteristics and qualities of the article, such as its color, odor, functions, dimensions or ingredients. A generic term identifies the general nature of an article, whereas a descriptive term indicates its special characteristics.

*Dayton Progress,* 917 F.2d at 839. Thus, were a lecture agency to adopt the name "The Speakers Bureau," it would be unable to protect this name as a trademark because the phrase "The Speakers Bureau" is generic and merely indicates the general nature of services a lecture agency provides. In the instant case, however, the addition of "Washington" to the phrase "Speakers Bureau" converts the generic name to a descriptive mark. Geographic terms are generally understood to constitute descriptive marks when they indicate the geographic source of the service or product.[19] The term "Wash-

18. Because "Washington" connotes more than mere geography, the mark "Washington Speakers Bureau" arguably requires some slight degree of associative or metaphorical interpretation to be fully understood. Yet, this alone does not make a mark suggestive. For example, the phrase "King Size" is often cited as an example of a descriptive mark when applied to large size men's clothing. *See, e.g., Sara Lee,* 81 F.3d at 464. To understand the mark, the consumer must rely upon the common association of kings with masculinity, bulk, and vastness, but this alone does not make "King Size" suggestive, since this association is universally understood. When an association is so automatic, it is de-

scriptive only, as the consuming public will immediately understand the nature of the product so described, without exercise of the imagination.

19. *See, e.g., Boston Beer Co. v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 181 (1st Cir.1993) ("[S]ocalled descriptive terms, such as a geographical term, ... can be protected, but only if it has acquired a 'secondary meaning' by which consumers associate it with a particular producer or source."); *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.,* 871 F.2d 590, 594 (6th Cir.,1989) ("Where it is determined that the mark as perceived by potential purchasers de-

ington" in "Washington Speakers Bureau" functions in part to identify the general location of the business [20] and thus is descriptive of the geographic source of the services provided by WSB. In this way, "Washington" describes characteristics and qualities of the service that WSB provides and thus converts the phrase "Washington Speakers Bureau" to a descriptive mark.

## B. Secondary Meaning of "Washington Speakers Bureau"

For a descriptive mark to merit trademark protection, the party claiming that protection must demonstrate that the mark has gained secondary meaning among the relevant consuming public. *See, e.g., Larsen,* 151 F.3d at 148. In the case of geographically descriptive marks, this occurs when "the mark no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source." *Resorts of Pinehurst,* 148 F.3d at 421. In other words, the mark merits protection when its primary significance to the consuming public is not the descriptive information it imparts, but the mark's association with a particular business or product.

■ A variety of factors is relevant to the secondary meaning inquiry and it is important to note that no single factor or particular combination of factors is dispositive of the question. The relevant factors include "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of

the mark's use." *Perini Corp.,* 915 F.2d at 125. These factors, applied here, point persuasively to the conclusion that "Washington Speakers Bureau" enjoys secondary meaning. First, it is undisputed that WSB has expended millions of dollars advertising "Washington Speakers Bureau" over the past 18 years, and Leading Authorities's president himself acknowledges almost daily receipt of WSB advertising material. Also, the record shows that WSB distributes advertising through direct mail to 14,000 customers included in its database. While no consumer studies have been provided demonstrating that consumers associate "Washington Speakers Bureau" with a particular source, it is undisputed that WSB has achieved prominence in its field. According to undisputed testimony by WSB's officers, WSB has also achieved substantial sales success, booking over 4,000 speeches each year for many consecutive years. Through the years, WSB has also received considerable unsolicited media coverage as demonstrated by a recent news database search offered by WSB that disclosed hundreds of articles specifically referring to "Washington Speakers Bureau" and its activities. The record thus clearly demonstrates that WSB has achieved great prominence in the speaking engagement industry and that the relevant public associates "Washington Speakers Bureau" with WSB. Indeed, Leading Authorities does not actively contest WSB's assertion that "Washington Speakers Bureau" has acquired secondary meaning among those members of the public who customarily use the services of speakers'

scribes the geographic origin of the goods the mark is primarily geographically descriptive."); *Midwest Research Inst. v. S & B Promotions, Inc.,* 677 F.Supp. 1007, 1011 (W.D.Mo.1988) ("In order, then, for plaintiff to prevail on its infringement claim, it must show that although the term Midwest Research Institute is geographically descriptive, because it describes the location of the institute as well as the original focus point of the institute's research, it has also achieved secondary meaning."); *Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785 (5th Cir.1984) ("A name such as Bank of Texas is not inherently distinctive, in that it combines the generic term 'bank' with the geographical term 'Texas.' Rather the name is descriptive of the type of services offered and the place from which such services originate.").

An exception to this rule exists where, as is not true here, a geographic term is used arbitrarily or suggestively, as in the case, for instance, of Dutch Boy paint. In such cases, the term may enjoy trademark protection without a showing of secondary meaning as an inherently distinctive mark. *See, e.g., Forschner Group, Inc. v. Arrow Trading Co.,* 30 F.3d 348, 354 (2d Cir.1994).

20. WSB is actually located outside the District of Columbia in Alexandria, Virginia, but is nevertheless within the Washington area, and WSB's founders have testified that they chose the "Washington Speakers Bureau" mark in part to give customers a general idea of their business's metropolitan location.

bureaus. As a result, "Washington Speakers Bureau" is a protectible descriptive trademark.[21]

### C. Likelihood of Confusion Between "Washington Speakers Bureau" and "washingtonspeakers.com"

To prevail on its § 43(a) infringement claim, WSB must demonstrate not only that its trademark is protectible, but that Leading Authorities has made use of a "colorable imitation" of that trademark that is likely to cause confusion among consumers. The relevant inquiry is thus whether Leading Authorities' use of "washingtonspeakers" (and "washington-speakers") in the domain names at issue constitutes a colorable imitation of "Washington Speakers Bureau" that is likely to confuse consumers as to the source or sponsorship of the Leading Authorities website. *See Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.,* 43 F.3d 922, 933 (4th Cir.1995). The likelihood of confusion is a factual issue that turns on the particular circumstances of each case. *Pinehurst,* 148 F.3d at 421.

■ The phrase *"washingtonspeakers"* does not precisely duplicate the protected "Washington Speakers Bureau." But this does not end the analysis, for absolute identity is not necessary for infringement; all that is necessary is enough similarity between the marks to confuse consumers. In determining whether there is a likelihood of confusion between two marks, courts consider a number of factors, including "(a) the strength or distinctiveness of the mark; (b) the similarity of the two marks; (c) the similarity of the goods/services the marks identify; (d) the similarity of the facilities the two parties use in their businesses; ·(e) the similarity of the advertising used by the·two parties; (f) the defendant's intent; (g) [evidence of] actual confusion." *Pizzeria Uno,* 747 F.2d at 1527. Certain factors may not be relevant in some

cases, and the factors may not deserve equal emphasis in each case. *Id.*

■ The first factor concerns the strength or distinctiveness of the trademark. The Fourth Circuit has emphasized that this analysis is distinct from the validity analysis detailed above. *Lone Star,* 43 F.3d at 933–35. Even if a mark is valid and protectible, it may be so weak that the public is not likely to be confused by the use of a similar mark on other goods and services.[22] *Id.* at 935. As established above, "Washington Speakers Bureau" is a descriptive mark, and thus a weak mark in the absence of secondary meaning. Furthermore, this circuit recognizes that when "some segment of the composite marks which both contesting parties use has a normally understood and well recognized descriptive or suggestive meaning" this "[leads] to the conclusion that that segment is relatively weak." *Petro Stopping Ctrs.,* 130 F.3d at 94. While the record establishes by a preponderance of evidence that "Washington Speakers Bureau" has achieved secondary meaning among the relevant consuming public, it is less clear whether the phrase "Washington speakers" (or "Washington Speakers") is interpreted by the consuming public to mean WSB or whether instead, the relevant public generally understands the shorter phrase as descriptive only and not indicative of any particular source. In this connection, WSB has provided several affidavits from speaker agency consumers stating that when they hear the phrase "Washington speakers" they immediately think of WSB. Leading Authorities has provided three affidavits from consumers of speaker agency services stating that they do not associate the phrase "Washington speakers" with a single agency, but rather think of it as a descriptive phrase for Washington personalities who address issues of interest to Washington. Leading Authorities also provided a wide array of examples of various publications' use of the phrase "Washington speakers" in a purely descriptive manner,

---

21. This conclusion also finds support in the finding *infra* that Leading Authorities registered the allegedly infringing *washingtonspeakers* domain names because of their similarity to "Washington Speakers Bureau" to gain a competitive advantage over WSB.

22. Indeed, even suggestive marks may be found weak under the first likelihood of confusion factor, despite the fact that they are assumed to be distinctive under validity analysis. *Petro Stopping Ctrs. v. James River Petroleum, Inc.,* 130 F.3d 88, 93 (4th Cir.1997).

with no connection made between the phrase and WSB. Additionally, Leading Authorities introduced evidence showing that WSB has never referred to itself as "Washington Speakers" in any advertising or publications and that no media coverage of WSB's activities has ever referred to WSB as "Washington Speakers." .

The affidavits submitted by WSB make this a close issue, but when balanced by the affidavits, advertising materials, and newspaper articles proffered by Leading Authorities, ultimately do not establish by a preponderance of evidence that a significant percentage of the consuming public understands the phrase "Washington speakers" (or "Washington Speakers") not as mere descriptive language, but as a signifier for WSB.[23] While "Washington Speakers Bureau" has been shown to be a distinctive mark by virtue of its secondary meaning among consumers, a mark as a whole may be stronger than the sum of its parts. *See generally California Cooler v. Loretto Winery, Ltd.*, 774 F.2d 1451 (9th Cir.1985) (noting that words that individually could not become a trademark may become a trademark when used in combination). In this instance, the individual segments of the "Washington Speakers Bureau" mark appear relatively weak and WSB has failed to establish the strength of these segments by a preponderance of the evidence. This weakness suggests that if an allegedly infringing mark is similar only to a segment of the "Washington Speakers Bureau" mark, it is less likely to confuse consumers, since they would not tend to associate this weak segment with WSB. Although this factor, on a close evidentiary call, suggests that confusion is not likely, it is not conclusive on this issue.

The second factor in the likelihood of confusion analysis focuses on the similarity between the protected mark and the alleged infringing mark. In considering this factor, courts look at each mark in its entirety, giving greater force and effect to the marks' dominant elements. *See Pizzeria Uno*, 747 F.2d at 1530. WSB argues that "Washington Speakers" is the dominant element of "Washington Speakers Bureau" and that the various *washingtonspeakers* domain names thus exactly replicate the dominant element of the mark and create a strong likelihood of confusion. Yet, the Fourth Circuit has held that "a descriptive word can never constitute the dominant part of a mark." *Id.* In general, this is because "the degree of similarity [that] is permissible between trademarks consisting of ordinary words, especially when such words are descriptive or geographical, is greater than that permissible between arbitrary or fanciful marks." *Intercontinental Mfg. Co. v. Continental Motors Corp.*, 43 C.C.P.A. 841, 230 F.2d 621, 623 (C.C.P.A. 1956). When common words that are likely to be chosen to describe similar products form part of a mark, use of those words in a competing product's mark will not cause confusion unless the secondary meaning of the first mark is so extensive in the relevant market that *any* use of these terms will lead to consumer confusion as to the source of a product.[24] Thus, the duplication of the phrase "Washington speakers" in Leading Authorities' domain names deserves no special weight in the confusion calculus. "Washington speakers" is a descriptive term composed of common words likely to be used to describe the services offered by Washington lecture agencies representing political speakers. Absent a persuasive demonstration of secondary meaning inherent in that term as distinct from "Washington Speakers Bureau," it cannot be construed as a dominant

---

23. The persuasiveness of the affidavits offered by WSB is somewhat compromised by the fact that they are form affidavits, all executed in nearly identical language. Several of the affidavits also come from persons with a longstanding business relationship with WSB, which casts some doubt upon the objectivity of the affiants. The affidavits offered by Leading Authorities suffer from similar flaws; but Leading Authorities does not have the burden of persuasion on this point.

24. *See Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 84 (2d Cir.1988) ("Moreover, 'physicians' is not only a common word, but a likely choice to be used with other words to suggest medical endorsement. It cannot be said as a matter of law that any mark conveying medical endorsement and using the word 'physicians' is likely to be confused with plaintiff's mark by consumers of skin care products.").

element of the mark. The challenged domain names do not contain the phrase "Washington Speakers Bureau." As a result, while the challenged domain names obviously bear substantial similarity to the protected mark, it is not clear that any portion of the protected mark may properly be characterized as "dominant" and thus especially relevant to the analysis. When the words duplicated are not the dominant part of a mark, the significance of the similarity is lessened.[25] In other words, if the allegedly infringing mark duplicates only a weak segment of the original mark, consumer confusion is less likely. Given WSB's failure to demonstrate by a preponderance of the evidence any strong consumer association between the phrase "Washington speakers" and WSB, it is not clear that the obvious similarity between the protected mark and the allegedly infringing domain names is likely to produce consumer confusion.

■ The third factor in the likelihood of confusion analysis focuses on the similarity of the services or product identified by the protected and the accused marks. The services provided by Leading Authorities and WSB are nearly identical. While WSB is more likely to represent speakers exclusively, whereas Leading Authorities is more likely to "broker" an event through arrangements with other speakers' bureaus, in point of fact both are sources to which event organizers may turn for high-profile speakers on business, politics, and public affairs. This similarity supports WSB's claim that Leading Authorities' use of the *washingtonspeakers* domain names will likely cause confusion in the relevant market.

■ The fourth factor involves the similarity of facilities the two parties use in their businesses. In this case, both parties use the Internet as a facility through which services are advertised and provided, which increases the likelihood of confusion between the two

marks. Furthermore, the special nature of the Internet and the particular manner in which domain names function within the Internet may also heighten the potential for confusion. *See Cardservice*, 950 F.Supp. at 741. This point merits elaboration. As noted above, a domain name allows a user to access directly the website associated with that domain name. When a user wishes to find a particular website, but does not know the domain name of that website, he or she will likely use an Internet "search engine" to pull up websites using keywords specified by the user in his or her search. Searches may yield hundreds or even thousands of websites, if the user's keywords commonly appear in websites. Thus, a search engine can be an unwieldy and cumbersome tool. To facilitate access to their websites, individuals and companies typically prefer to have a domain name that is memorable and that may even be surmised by users who do not know their exact website address. For instance, a user seeking the Coca–Cola website might presume, correctly as it happens, that entering the address *www.coke.com* will turn up a Coca–Cola website. And significantly, a particular domain name can only identify one website, just as a particular mailing address can only identify one physical location. Thus, a company that owns an intuitive domain name owns a potentially valuable asset, as ownership of such a name makes it more likely that users will accurately surmise its website address and visit its corporate website rather than the website of a competitor. The value of this intuitive name is magnified by the fact that there is no exhaustive, central listing of Internet domain names equivalent to a phone book. *See generally Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1327 (9th Cir.1998); *Cardservice*, 950 F.Supp. at 741.

These facts of Internet life make it somewhat more likely that consumers seeking

**25.** Additionally, as noted above, the factual record indicates that WSB invariably refers to itself in advertising and other communications by the full name "Washington Speakers Bureau" or the initials "WSB." So, too, do the media in reporting upon WSB's activities. Some courts have concluded that when a company always uses its full name as its mark, a competitor's duplication of a portion of that mark is less significant to the likelihood of confusion analysis. *See First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F.Supp. 693, 704 (E.D.Pa.1996) ("[T]he evidence demonstrates that in all written or 'official' communications, the parties' full names are always used, and in this way the dominant portion of the mark is tempered.").

WSB on the web will find Leading Authorities' website advertising similar services and become confused. · Because there is a limit on the number of letters that may be used in a domain name, users attempting to deduce WSB's web address might simply drop the last word in WSB's name, try to access the site at *www.washingtonspeakers.com* (or *www.washington–speakers.com*, or the other variations owned by Leading Authorities), and mistakenly arrive at Leading Authorities' website. Absent an Internet analog to directory assistance, Leading Authorities' domain names might in this way cause significant confusion.

The fifth factor in the likelihood of confusion analysis is the advertising used by the two parties. WSB's and Leading Authorities' advertising is similar in that both rely upon websites to attract potential customers. Both parties' websites explain the services and speakers available through their respective organizations. Of course, Leading Authorities' website emphasizes the "Leading Authorities" trademark, while WSB's · site emphasizes the "Washington Speakers Bureau" mark. Nevertheless, a basic similarity exists between the advertising of the two parties, increasing the likelihood of confusion between the two.

 The sixth factor, and in this case a crucial one, is the alleged infringer's intent in adopting the allegedly infringing mark. WSB contends that the similarities between various Leading Authorities' domain names and the names of competing lecture agencies demonstrate that Leading Authorities registered these domain names, including those in issue here, in a bad faith attempt to siphon business from their competitors. Leading Authorities responds that the various registered domain names are simply descriptions of Leading Authorities' services and that no attempt was made to choose names similar to

those of competing businesses. This contention is belied by Leading Authorities' registration of *empirespeakers.com*, which bears a striking resemblance to the New York booking agency for entertainment speakers known as Empire Entertainment. While Leading Authorities could conceivably have registered such domain names as *celebrity-speakers.com* or *american-speakers.com* in a simple good faith attempt to describe its services, without the intent to attract customers seeking the services of Celebrity Speakers, Inc., or American Speakers Bureau, it is difficult to imagine an analogous good faith descriptive function performed by the domain name *empirespeakers.com*. The only convincing, or even plausible, rationale advanced for Leading Authorities' registration of this domain name is the similarity of the name to the mark of a competitor, Empire Entertainment. Given that Leading Authorities registered this domain name with the intent of approximating the name of a competitor and attracting Internet business that might otherwise go to the competitor, it follows that Leading Authorities more probably than not registered for other domain names, including the *washingtonspeakers* names, with the same intent.[26]

The conclusion that Leading Authorities registered for · the *washingtonspeakers* names in bad faith is bolstered by the fact that the Leading Authorities' employees who chose the *washingtonspeakers* domain names have acknowledged that they were aware of WSB and its prominent place in the market at the time they chose the domain names. No doubt they noticed the similarity between the *washingtonspeakers* domain names they registered and the mark of one of their most high-profile competitors. While knowledge of a senior user's mark "does not necessarily give rise to a presumption of bad faith,"[27] in light of the evidence suggesting that other

**26.** The fact that Leading Authorities registered various *blanchard-speakers* domain names at this time also lends weight to the conclusion that it adopted some of its domain names because of their similarity to competitors' marks. While Leading Authorities sought and received permission to use the *blanchard-speakers* names from Blanchard Training and Development and while there was nothing improper about these registrations as a result, the fact that Leading Authorities

conceived of the *blanchard-speakers* addresses as possible domain names suggests an alertness to the benefits of using a competitor's name as an identifier.

**27.** *Mondo, Inc. v. Sirco Int'l Corp.*, No. 97 Civ. 3121, 1998 WL 849401, at *10 (S.D.N.Y. Dec.7, 1998).

domain names were selected expressly because of their similarity to competitors' names, the *washingtonspeakers* names were more likely than not chosen in part because of this very similarity in a "bad faith" attempt to attract business that might otherwise have gone to WSB and to place barriers in the path of WSB's use of the Internet to attract customers.[28]

When a defendant intentionally copies a protected mark, "motivated by an intent to exploit the good will created" by the protected trademark, confusion is presumed. *Shakespeare Co. v. Silstar Corp.*, 110 F.3d 234, 241 (4th Cir.1997). This is because courts "presume that the person who sets out to infringe on another's trademark has more brains than scruples and will likely succeed." *Sara Lee*, 81 F.3d at 466. In other words, the decision of a presumably business-savvy organization to adopt a mark similar to the name of a competitor in an attempt to attract the competitor's customers is taken as compelling evidence that the mark adopted will in fact confuse consumers by its similarity to the protected mark. This is precisely the case here.

The final factor in the likelihood of confusion analysis is evidence of actual confusion. Anthony D'Amelio, an employee of WSB, gave deposition testimony that he had received a "couple" of E-mail messages from customers expressing confusion while the Leading Authorities *washingtonspeakers* domain names were operational. The testimony on this point was vague and unsupported by the E-mail text or by any contemporary notes or record of the complaints. Indeed, it is not completely clear whether the E-mails described expressed actual confusion or whether the messages were simply meant to alert WSB that the *washingtonspeakers* names were being used by another organization. "[A]ctual confusion usually implies a likelihood of confusion," [29] but given the lack

of detail on these points, no weight is accorded to this evidence.

■ In summary, evaluation of the factors enumerated above compels the conclusion that the challenged Leading Authorities domain names create a likelihood of confusion. In particular, the similarities between the services provided by Leading Authorities and WSB, the similarities in their advertising for these services, the fact that both use the Internet with its particular potential for confusion, and most importantly, Leading Authorities' intent in adopting the *washingtonspeakers* domain names demonstrate that it is more likely than not that consumers will be confused by the challenged domain names. While the record otherwise suggests that the phrase "Washington Speakers" is a weak segment of the "Washington Speakers Bureau" mark provoking limited consumer association with WSB, Leading Authorities' behavior in intentionally appropriating the mark constitutes conclusive evidence to the contrary.

### C. Leading Authorities' Fair Use Defense

■ Where a competitor's use of a valid, protected mark creates a likelihood of confusion, a defendant may nevertheless prevail under the Lanham Act by demonstrating that its use of the challenged mark constitutes a "fair use." *See Shakespeare Co.*, 110 F.3d at 243 (noting that finding of likelihood of confusion did not preclude "fair use" defense since "it defies logic to argue that a defense may not be asserted in the only situation where it even becomes relevant"). Specifically, the Lanham Act provides that "the use of the name, term or device charged to be an infringement in a use, otherwise than a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin" is fair use of the name, term, or device and cannot constitute infringement. 15 U.S.C.

---

28. It bears noting that in this context, the phrase "bad faith" with its connotations of moral turpitude or opprobrium seems inapt. Leading Authorities here simply displayed an excess of competitive zeal, and may have in fact believed (incorrectly) that the phrase *"washingtonspeakers"* was a generic description in which WSB could hold no rights, even as it knowingly

and deliberately attempted to profit from the similarity between the phrase and WSB's mark.

29. *Country Floors, Inc. v. A Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1064 (3d Cir.1991).

§ 1115(b)(4). Leading Authorities argues that its use of the *washingtonspeakers* domain names constitutes just such a descriptive fair use. This argument fails; its fatal flaw is the finding here that Leading Authorities' adoption of the domain names in question was not undertaken in good faith. Good faith is a prerequisite for success under the "fair use" defense. *See id.* Therefore, Leading Authorities cannot claim "fair use," and WSB succeeds in its § 43(a) infringement action.

## III. TRADEMARK DILUTION

■■■ WSB alleges that Leading Authorities' use of the *washingtonspeakers* domain names constitutes trademark dilution in violation of the Federal Trademark Dilution Act (FTDA). 15 U.S.C. § 1125(c). The FTDA defines dilution as

> The lessening of a capacity of a famous mark to identify and distinguish goods and services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception.

15 U.S.C. § 1127. In a federal dilution action, a plaintiff bears the burden of proving (i) that it owns a famous mark, (ii) that the defendant adopted its mark after the plaintiff's mark became famous, and (iii) that the defendant's mark dilutes the famous mark. *Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 955 F.Supp. 605, 613 (E.D.Va.1997). Thus, to prevail here, WSB must establish by a preponderance of the evidence that "Washington Speakers Bureau" was a "famous" mark by March, 1998, and that Leading Authorities' use of the offending domain names dilutes this mark.

### A. Is "Washington Speakers Bureau" a Famous Mark?

■■■ Marks protected under the FTDA are those marks that are "distinctive and famous." 15 U.S.C. § 1125(c)(1). This language reflects " 'the policy goal that to be protected, a mark [must] be truly prominent and renowned.' " *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 45 (1st Cir.1998) (quoting the *1987 Trademark Review Commission Report,* the precursor to the FTDA). The FTDA's language and its underlying policy dictate that courts must "be discriminating and selective in categorizing a mark as famous." *Id.* at 45. In applying this "fame" requirement, courts have uniformly held that "[t]o be capable of being diluted, a mark must have a degree of distinctiveness and 'strength' beyond that needed to serve as a trademark." [30] Thus, a plaintiff cannot demonstrate that its mark is famous simply by showing that the mark has acquired secondary meaning in the relevant market; secondary meaning "is merely a minimum threshold for establishing protectibility of a trademark that is not suggestive, arbitrary, or fanciful." *Star Markets,* 950 F.Supp. at 1033. Indeed, one commentator has stated that the mere acquisition of secondary meaning is "nowhere near sufficient" to achieve the status of "famous" mark. *See I.P. Lund,* 163 F.3d 27, 46 (quoting 3 *McCarthy on Trademarks and Unfair Competition* § 24:91).

■■■ The FTDA provides a nonexclusive list of eight factors courts must consider in determining whether a mark is "distinctive and famous":

> (A) the degree of inherent or acquired distinctiveness of the mark;
>
> (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
>
> (C) the duration and extent of advertising and publicity of the mark;

---

**30.** *Petro Shopping Ctrs. v. James River Petroleum,* C.A. No. 3:96CV530, 1997 WL 187335, at \*3 (E.D.Va. Jan.17, 1997), *aff'd* 130 F.3d 88 (4th Cir.1997); *see also Michael Caruso & Co., Inc., v. Estefan Enterprises, Inc.,* 994 F.Supp. 1454, 1463 (S.D.Fla.1998) ("[To be distinctive and famous], a mark must clearly be more than just distinctive in a trademark sense, and must rise to the level

of 'Buick' or 'Kodak.' "); *Star Markets, Ltd. v. Texaco, Inc.,* 950 F.Supp. 1030, 1033 (D.Haw. 1996) ("A mark must be especially famous and distinctive to merit protection under the Act because a violation of the Act triggers extensive relief—preventing all others from using the mark, regardless of whether the marks are in related fields or are those of competitors.").

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

As established above, "Washington Speakers Bureau" has achieved secondary meaning in its market. Whether "Washington Speakers Bureau" has garnered the requisite fame to be protected under the FTDA, however, is less apparent. Much of the relevant·case law indicates that marks famous only in a specialized market, rather than well-known to the general public, should not be considered "famous" under the federal dilution statute.[31] The record contains little evidence demonstrating that the "Washington Speakers Bureau" mark is at all well-known outside its specialized market, and so under this interpretation of the FTDA, it could not be considered famous. Other authorities, however, suggest that when a mark is famous only in a specialized segment of the market, it may be protected from dilution when the diluting

uses are directed narrowly at the same market segment. *See Teletech Customer Care Management, Inc. v. Tele–Tech Co.,* 977 F.Supp. 1407, 1413 (C.D.Cal.1997); 3 *McCarthy on Trademarks and Unfair Competition* § 24:112 (4th ed. 1996 & Supp.1998); *Restatement (Third) of Unfair Competition,* § 25, comment e (1995). Here, the allegedly diluting use of the mark made by Leading Authorities is directed at precisely the same market segment in which "Washington Speakers Bureau" is recognized, and under the latter theory, if "Washington Speakers Bureau" were famous within that market segment, Leading Authorities' use of the mark could constitute dilution.

This latter theory of niche market fame and dilution is somewhat weakened by the fact that Congress explicitly crafted the FTDA to prevent dilution of trademarks even by those users of a famous mark who were not in competition with the famous mark's owner.[32] Given this Congressional purpose, it seems an odd act of statutory interpretation that permits the owner of a famous mark to prevent dilution only by competitors in the owner's niche market, particularly since in such an instance, relief would likely already be available to the mark's owner under a § 43(a) infringement theory. On the other hand, the language of the FTDA itself lends some support to the idea that marks famous in niche markets can be protected from diluting uses directed at the same narrow market; it provides that

31. *See, e.g., I.P. Lund,* 163 F.3d 27, 46 ("[N]ational renown is an important factor in determining whether a mark qualifies as famous under the FTDA. Although the district court found that 'in the world of interior design and high-end bathroom fixtures, the [mark] is renowned,' and that the mark has been featured and advertised in national magazines and displayed in museums, whether the [mark's] identifying design is sufficiently famous to qualify for the FTDA's protection is far from clear."); *Breuer Elec. Mfg. Co. v. Hoover Co.,* No. 97 C 7443, 1998 WL 427595, at *16 (N.D.Ill. July 23, 1998) ("While these marks are registered and have been used for many years on products sold nationwide, Breuer/Tornado has provided little evidence that these marks have acquired a degree of recognition sufficient to be considered famous, particularly outside of the narrow market for commercial vacuums and floor cleaning"); *Michael Caruso & Co.,* 994 F.Supp. at 1463 ("Even if a mark is

distinctive in its particular market, [this] does not render it inherently distinctive so as to engender immediate recognition in the general public of a particular product."); *King of the Mountain Sports, Inc. v. Chrysler Corp.,* 968 F.Supp. 568, 578 (D.Colo.1997) ([H]ere there is no evidence that persons outside of plaintiff's niche market would associate the phrase "King of the Mountain" with plaintiff.).

32. Sponsors of the bill stated:

[T]his bill is designed to protect famous trademarks from subsequent uses that blur the distinctiveness of a mark or tarnish or disparage it, even in the absence of a likelihood of confusion. Thus, for example, the use of DuPont shoes, Buick aspirin, and Kodak pianos would be actionable under this bill..

141 Cong.Rec. S19306, S19310 (Daily ed. Dec. 29, 1995).

one factor to be considered in determining whether a mark is famous is "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought." 15 U.S.C. § 1125(c)(1)(F).

In the instant case, it is ultimately unnecessary to resolve this still-unsettled question, since even if fame in a niche market were sufficient to establish fame under the Act, consideration of the statutory factors reveals that WSB has failed to make even this demonstration. To be sure, some of the statutory factors support WSB's claim that "Washington Speakers Bureau" is a famous mark in its field. The mark has been used nationally for almost twenty years and has been the subject of extensive advertising directed at those organizations that most commonly use the services of speakers' bureaus. All of the affidavit and testimonial evidence in the record acknowledges that WSB is a prominent and perhaps even dominant player in its market and that its mark is well known as a result. Yet fame among competitors and speakers is not sufficient to characterize the mark as famous if "Washington Speakers Bureau" has not achieved similar fame throughout its entire consumer base. Many of WSB's customers regularly use the services of speakers' bureaus and may be assumed to be knowledgeable about the major players in the industry and aware of WSB and its mark. Yet according to the testimony of Mr. Swain, the Vice–President of WSB, WSB's customers also include "people who have never, ever done this before and are not aware of any distinguishing factor about any speaker.... [P]eople call me every day [who] have no idea what kind of process to go through and ask me how to go through the process." According to Mr. Swain, WSB's customers are "equally distributed" between this category of novice consumers and experienced repeat players. While the record indicates that the "Washington Speakers Bureau" mark may be well-known among customers who regularly employ speakers' bureaus, Mr. Swain's testimony suggests that many of WSB's customers lie outside this universe. The FTDA's legislative history and its interpretive case law plainly indicate

that courts should be discriminating and selective in construing marks as famous. Given the testimony that many of WSB's customers are not knowledgeable about the speakers' bureau market and the lack of evidence showing that the "Washington Speakers Bureau" mark is famous among such inexperienced customers, WSB has failed to meet this high threshold.

The conclusion that "Washington Speakers Bureau" is not famous is bolstered by WSB's failure to register the "Washington Speakers Bureau" mark prior to commencement of this litigation. Registration is a factor in determining whether a mark is famous under the FTDA, "[t]he logic [being] that if the owner of an allegedly 'famous' mark did not even bother to take the commercially ordinary and minimal step of federally registering the mark, this is an admission against interest that the mark is not 'famous.'" 3 *McCarthy on Trademarks and Unfair Competition* § 24:92. The failure to register is not determinative, but it undermines WSB's contentions of fame. Finally, evidence of third parties' use of marks similar to "Washington Speakers Bureau" such as the "Washington Chapter Speakers Bureau," the "Washington State University Speakers Bureau," and a "Washington Speakers Series" organized by UCLA, while not compelling, further suggests that WSB's mark is not sufficiently distinctive and famous to merit the protection of the antidilution statute.

In conclusion, WSB has failed to offer the high quantum of proof required to characterize a mark as truly famous and renowned and so protectible under the FTDA. Thus, WSB's dilution claim must fail.

## IV. REMEDY

In light of Leading Authorities' infringement of WSB's mark by use of its *washingtonspeakers* domain names, Leading Authorities must relinquish all rights to the four domain names at issue. Cf. *Cardservice*, 950 F.Supp. at 743; *Intermatic, Inc. v. Toeppen*, 947 F.Supp. 1227, 1241 (N.D.Ill.1996) (enjoining defendant from making further use of offending domain name and requiring defendant to relinquish all rights to that name).

Given the brief period in which the domain names were actually used by Leading Authorities, no damages have accrued in this case, and none shall be awarded. An appropriate order shall issue.