December 12, 2001
**THIS OPINION IS CITABLE AS PRECEDENT OF THE T.T.A.B.**
Paper No. 11
AD

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

The Toro Company
v.
ToroHead, Inc.
_____

Opposition No. 114,061
to application Serial No. 75/372,652
filed on October 14, 1997
_____

Linda M. Byrne of Merchant & Gould P.C. for The Toro Company.

Michael B. Einschlag for ToroHead, Inc.
_____

Before Sams, Chief Administrative Trademark Judge and Seeherman, Quinn, and Drost, Administrative Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

An application has been filed by ToroHead, Inc. (applicant) to register the mark "ToroMR" and bull's head design, shown below, for goods ultimately identified as "very low reluctance, thin film magnetic reading and writing heads for sale to OEM manufacturers of high

performance computer disk drives, in International Class 9."[1]



Registration has been opposed by The Toro Company (opposer) on the grounds that applicant's mark so resembles its marks for TORO for a variety of goods and services, which have been previously used and registered by opposer, as to be likely to cause confusion or mistake or to deceive. Opposer's registrations for the word TORO in stylized or design form are set out below.[2]

---

[1] Serial No. 75/372,652, filed October 14, 1997, based on an allegation of a bona fide intention to use the mark in commerce.
[2] Registration No. 529,845, issued August 29, 1950, for the mark TORO (stylized) for "grass cutting machinery – namely engines for power lawn mowers, self-propelled power plants for pulling lawn mowers, hand lawn mowers and self-contained power mowers"; third renewal;

Registration No. 755,846, issued September 3, 1963, for the mark TORO for "turf tractors, utility cars, and motorized golf cars"; first renewal;

Registration No. 769,393, issued May 12, 1964, for the mark TORO for "underground sprinkling systems, including valves, sprinkler heads, controls, and related equipment"; first renewal;

Registration No. 894,142, issued July 7, 1970, for the mark TORO for "tires, drive belts, and fluid handling hose"; second renewal;

Registration No. 944,516, issued October 10, 1972, for the mark TORO for "trucks"; first renewal;

Registration No. 961,987, issued June 26, 1973, for the mark TORO for "machines for grading, leveling, scarifying, slicing, aerating, seeding, fertilizing, rolling, and raking"; first renewal;

Registration No. 1,097,952, issued August 1, 1978, for the mark TORO for "replacement spools and cutting line for vegetation cutting apparatus"; first renewal;

Registration No. 1,109,798, issued December 26, 1978, for the mark TORO for a chemical for making compost for domestic use, machinery paint, metal pipes and tubes, wheel weights, chains of links, non-electric control cables, cable clips, fastening hardware – namely bolts, screws, nut rivets, cotter pins, ground maintenance and earth moving machinery, apparatus for use in conjunction with irrigation and snow removal, measuring gauges, radiator caps, earth working tractors, pens, shipping tape, umbrellas, starting cords, powered equipment repair services, educational and instructional clinic services in the field of machine repair and other goods and services in International Classes 1, 2, 6, 7, 8, 9, 11, 12, 16, 17, 18, 22, 37, and 41; first renewal;

Registration No. 1,137,331, issued July 1, 1980, for the mark TORO for "vegetation cutting machine and parts thereof"; first renewal;

Registration No. 1,150,168, issued April 7, 1981, for the mark TORO for "lubricating oils and greases"; first renewal;

Registration No. 1,154,592, issued May 19, 1981, for the mark TORO for "hand held and back pack debris blowers"; first renewal;

Registration No. 1,156,106, issued June 2, 1981, for the mark TORO (stylized) for grounds maintenance and light earth working machinery in International Class 7; first renewal;

Registration No. 1,180,886, issued December 8, 1981, for the mark TORO for "power cultivators, chain saws and their parts"; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 1,205,656, issued August 17, 1982, for the mark TORO for "rendering technical aid in the establishment and operation of retail store services in the field of powered lawn

mowers, tillers, and snow throwers"; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 1,224,513, issued January 18, 1983, for the mark TORO for "financial services – namely, extending credit services, credit union services, and administering an employee stock purchase plan"; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 1,287,819, issued July 31, 1984, for the mark TORO and design for "underground irrigation systems comprising controllers, valves, valve actuators, sprinkler heads, and parts thereof"; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 1,456,174, issued September 8, 1987, for the mark TORO and design for ground maintenance and light earth moving machines in International Class 7; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 1,456,175, issued September 8, 1987, for the mark TORO and design for ground maintenance and light earth moving machines in International Class 7; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 1,530,931, issued March 21, 1989, for the mark TORO (stylized) for clothing sold only to applicant's employees and customers; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 1,681,922, issued April 7, 1992, for the mark TORO for "water aeration unit comprising high-speed propeller for drawing air into water"; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 1,750,030, issued February 2, 1993, for the mark TORO and design for "water aeration unit comprising high-speed propeller for drawing air into water for commercial use"; Section 8 and 15 affidavits accepted and acknowledged;

Registration No. 2,017,726, issued November 19, 1996, for the mark TORO for "electrical lighting fixtures";

Registration No. 2,021,069, issued December 3, 1996, for the mark TORO for "fertilizers, soil amendments and trace mineral supplements for commercial landscaping use";

Registration No. 2,022,145, issued December 10, 1996, for the mark TORO for "computerized consulting services relating to

4





Applicant denied the salient allegations of the notice of opposition.  In addition, on March 22, 2000, opposer filed a motion to amend the notice of opposition in two ways.  The first amendment alleged that opposer uses a common law mark MIR along with its registered mark TORO for computerized satellite controllers for irrigation systems.  Amended Notice of Opposition, p. 2, ¶ 6.  Secondly, opposer added a claim that the mark "ToroMR" and bull's head design is "likely to dilute the distinctive quality of Opposer's famous TORO mark."

---

computerized controllers for underground automatic turf irrigation systems";

Registration No. 2,022,147, issued December 10, 1996, for the mark TORO and design for "computerized consulting services relating to computerized controllers for underground automatic turf irrigation systems"; and

Registration No. 2,022,219, issued December 10, 1996, for the mark TORO and design for "fertilizers, soil amendments and trace mineral supplements for commercial landscaping use."

Amended Notice of Opposition, p. 5, ¶ 18. Applicant did not oppose the amendment of the notice of opposition. In a Board order dated July 19, 2000, a decision on the motion to amend was deferred until final hearing. Opposer's motion is granted. See the full discussion thereof later in this opinion.

## The Record

The record consists of the file of the involved application; the trial testimony deposition, with accompanying exhibits, of Don St. Dennis, managing director of corporate communications of opposer; the status and title copies of the 26 pleaded registrations of opposer; applicant's responses to opposer's interrogatories; opposer's responses to applicant's interrogatories; and the trial testimony deposition, with one exhibit, of Uri Cohen, president of applicant.

Both parties filed briefs and an oral hearing was requested by opposer and scheduled. Subsequently, both parties declined to appear at the oral hearing.

## Priority

Priority is not an issue here in view of opposer's submission with its notice of reliance, as well as the identification during the testimony of Don St. Dennis, of status and title copies of the 26 noted registrations for

the mark TORO.  See King Candy Co. v. Eunice King's
Kitchen, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Likelihood of Confusion

The first major issue we address is the question of
whether there is a likelihood of confusion.  The Court of
Customs and Patent Appeals, one of the predecessor courts
of the Court of Appeals for the Federal Circuit, set out
a non-exclusive list of thirteen factors to be considered
when determining whether one mark is likely to cause
confusion with another mark.  In re E.I. du Pont de
Nemours & Co., 476 F.2d 1357, 1361, 177 USPQ 563, 567
(CCPA 1973).  We begin our discussion by analyzing the
applicant's and opposer's marks under the du Pont
factors.

> (1)  The similarity or dissimilarity of the marks in
>      their entireties as to appearance, sound,
>      connotation and commercial impression.

Opposer has numerous registrations for the mark TORO
in typed and stylized form and as part of a design.  It
is well settled that it is improper to dissect a mark,
and that marks must be viewed in their entireties.  In re
Shell Oil Co., 992 F.2d 1204, 1206, 26 USPQ2d 1687, 1688
(Fed. Cir. 1993).  However, more or less weight may be
given to a particular feature of a mark for rational

7

reasons.  In re National Data Corp., 753 F.2d 1056, 1058, 224 USPQ 749, 751 (Fed. Cir. 1985).

Applicant's mark includes the entire registered mark TORO with the added letters MR and a design.  Applicant's mark is depicted in a stylized form in which the initial "T" is capitalized and the next three letters are in lower case, followed by upper case letters "MR" to create the term "ToroMR."  Also, applicant's mark includes a bull's head design.  The word TORO, the only word in opposer's mark, is thus prominently featured in applicant's mark and it is the only pronounceable word in applicant's mark.  Applicant admits that "MR" stands for magnetoresistive (Cohen dep., p. 11).  "Applicant agrees with Opposer that the letters 'MR' must be pronounced individually, and that Applicant's use of capital letters encourages such use."  Brief for Applicant, p. 16.  Thus, prospective purchasers are likely to pronounce the letters "MR" at the end of applicant's mark as individual letters.  Furthermore, applicant's use of a special form drawing actually highlights the word TORO in applicant's mark because it is clear that the word "toro" will be perceived and pronounced separately from the letters "MR."  Because of the prominence of the term TORO in both marks and the lack of other significant differences, it

8

is the dominant part of applicant's mark.  In re Dixie Restaurants Inc., 105 F.3d 1405, 1407, 41 USPQ2d 1531, 1534 (Fed. Cir. 1997) (The Federal Circuit held that THE DELTA CAFE and design was confusingly similar to DELTA; more weight given to the common dominant word DELTA). See also Wella Corp. v. California Concept Corp., 558 F.2d 1019, 194 USPQ 419 (CCPA 1977)(CALIFORNIA CONCEPT and design likely to be confused with CONCEPT for hair care products).

Applicant argues that the marks have a different connotation:

> However, in Applicant's case, the word Toro has a suggestion and a connotation relating to toroidal (relating to a shape of the thin film head)(Cohen, p.11, lines 10-21).  Further, the letters "MR" in Applicant's mark stands for magnetorestrictive which is indicative of the manner in which information is read into the thin film head (Cohen, p. 11, line 22 – p. 12, line 1).

Brief of Applicant, p. 17.

Even assuming that the term "ToroMR" and bull design used on thin film head may have an alternative meaning from the mark TORO on opposer's products and services, the marks are still similar in sound and appearance, and the possible different meanings would not eliminate the similarities of the marks.  National Data, 753 F.2d at 1060, 224 USPQ at 749.  This du Pont factor favors opposer.

9

(2) The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use.

Applicant's goods are identified as "very low reluctance, thin film magnetic reading and writing heads for sale to OEM manufacturers of high performance computer disk drives."  Applicant's witness describes "thin film head" as:

> a transducer that writes and reads the information to the disk and from the disk.  It is microscopic – it's a very, very tiny device, about a few millimeters on each side.  We manufacture it by technology similar to integrated circuits.

Cohen dep. at 7.

"The thin film heads are marketed through contacting some of the manufacturers, the disk drive manufacturers, which are very few.  In the United States, there are probably about five or eight at the most, for disk drives.  I can name a few:  IBM, Maxtor, Western Digital. In the entire world, there are maybe less than ten or about ten companies altogether."  Cohen dep. at 8 – 9. The record establishes that applicant's goods are highly technical parts for computers that are sold to hard drive original equipment manufacturers.  These hard drives are then incorporated into computers.

Opposer's goods are numerous, and opposer summarizes the many products and services with which the mark TORO

10

is associated as "a wide variety of professional lawn mowers and consumer lawn mowers, irrigation systems, computerized irrigation controllers, vehicles, work vehicles, string equipment, blower vacuums, trimmers, string trimmers."  St. Dennis dep. p. 15.  Hence, we will focus on this list in our discussion of the du Pont factors.

We must compare the goods and services as described in the application and the registrations to determine if there is a likelihood of confusion.  Canadian Imperial Bank v. Wells Fargo Bank, 811 F.2d 1490, 1493, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987).  Opposer argues that its goods are closely related to applicant's goods and points to its registrations for computer consulting services and its computer-based irrigation and fertigation[3] systems.  Br. at 16.  However, there is certainly no rule that all computer products and services are related.  In re Quadram Corp., 228 USPQ 863, 865 (TTAB 1985) ("[W]e think that a per se rule relating to source confusion vis-a-vis computer hardware and software is simply too rigid and restrictive an approach and fails to consider the realities of the marketplace").  See also Electronic

---

[3] Fertigation refers to the application of nutrients using an irrigation system by introducing the nutrients into the water flowing through the system.  St. Dennis dep., p. 19.

Design and Sales Inc. v. Electronic Data Systems, 954 F.2d 713, 21 USPQ2d 1388 (Fed. Cir. 1992) (No confusion between battery chargers and power supplies and computer services). Here, applicant's identification of goods is specifically limited to parts used in high performance computer hard drives sold to original equipment manufacturers. Applicant's goods are significantly different and seemingly unrelated to any of the goods or services of opposer. While opposer does sell highly complicated computer-controlled irrigation systems, those systems are distinctly different from applicant's very low reluctance, thin film magnetic reading and writing heads. In Hasbro Inc. v. Clue Computing Inc., 66 F. Supp.2d 117, 122, 52 USPQ2d 1402, 1406 (D. Mass. 1999), aff'd, 232 F.3d 1, 56 USPQ2d 1766 (1st Cir. 2000), the court held that it would be "an extraordinary stretch to assert that Hasbro's technical support to game users is similar in any meaningful way to the 'computer consulting services' provided by Clue Computing." It would likewise be an extraordinary leap to find that applicant's thin film heads sold to original equipment manufacturers are related to opposer's computerized irrigation systems or other products or services in the context of our legal analysis. Indeed, the CCPA has held in another case

12

involving the mark TORO that: "Toro cannot prevail merely on the ground that 'rubber element shaft couplings' may be contained in some of Toro's machines." Falk Corp. v. Toro Manufacturing Corp., 493 F.2d 1372, 1378, 181 USPQ 462, 467 (CCPA 1974). It would be untenable to find that the parties' goods are related merely because applicant sells parts for computer hard drives that would be sold to hard drive manufacturers to be used in hard drives that would in turn be sold to computer manufacturers to be incorporated into computers that would eventually be sold by opposer as part of its computerized irrigation systems. Thus, this factor favors applicant.

    (3) The similarity or dissimilarity of established, likely-to-continue trade channels.

Applicant's product has not been sold (Cohen dep. at 23), but applicant's president has indicated that it will be marketed to the approximately ten companies in the world that manufacture disk drives. Cohen dep. at 9. The identification of goods specifically limits their sale to original equipment manufacturers. Opposer has indicated that it sells its products at retail stores such as Home Depot and Lowe's and through its dealer network. There is no indication that applicant's goods and opposer's goods or services will ever be sold in the

13

same channels of trade.  Thus, this factor favors applicant.

> (4)  The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasers.

Applicant's goods clearly will be sold to buyers who would be extraordinarily careful and sophisticated.  The testimony indicates that the goods will be marketed to disk drive manufacturers who exercise the greatest care in purchasing thin film heads.

> It takes, at the very best, six months for those manufacturers to evaluate the product, and then it's always a process back and forth.  They come back and they ask for certain improvements; they tell you what's wrong with your product; they come back, request that you do some changes, and back and forth, back and forth.  At the very best, only six months.  It typically takes much longer than that.
>
> And those are companies in the multibillion [dollar] business, and it's their main business.  They know exactly what they are buying.  They don't have any doubt whatsoever as to what the product is and whom they deal with.

Cohen dep. at 9.

On the other hand, opposer's goods are sold to two types of purchasers:  professionals and residential homeowners.  Professionals include golf course superintendents, golf course architects, sports field groundskeepers, municipal facility managers of large resorts and office buildings, and landscape contractors. St. Dennis dep. at 11.  Other customers include schools

14

and universities and agricultural customers.  St. Dennis dep. at 11 – 12.  There is no evidence that would indicate that opposer's products would, generally speaking, be purchased on impulse, whether it is a lawnmower for a homeowner or an irrigation system for a golf course.  Because applicant's customers would clearly be sophisticated purchasers and opposer's purchasers would often be sophisticated, too; and because neither party's goods or services would normally be considered an impulse purchase, the resolution of this factor favors applicant.

(5)  The fame of the prior mark.

With this factor, we look at what fame the mark has achieved in the marketplace.  "Thus, a mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark."  Kenner Parker Toys v. Rose Art Industries, 963 F.2d 350, 353, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).  At this point, we note that fame for likelihood of confusion purposes and fame for dilution purposes are not necessarily the same.  A mark may have acquired sufficient public recognition and renown to demonstrate that it is a strong mark for likelihood of confusion purposes without meeting the stringent requirements to

15

establish that it is a famous mark for dilution purposes. I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 47, 49 USPQ2d 1225, 1239 (1st Cir. 1998) ("[T]he standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection"). Therefore, we will refer to "public recognition and renown" when we are discussing fame in the context of likelihood of confusion.

The evidence of public recognition and renown in this case consists of opposer's testimony that it has over $1.3 billion in annual sales, that it spends $35 to $40 million annually on advertising, and that it advertises in trade journals, daily newspapers, national publications, and on national television. St. Dennis dep. at 43 – 44, and 49. Opposer has included a number of its brochures and a videotape of television commercials as exhibits to the St. Dennis deposition. As a result of this evidence, and despite applicant's president's testimony that he never heard of the Toro Company or its marks (Cohen dep. at 12), we conclude that opposer's mark when used on lawn care and maintenance equipment and services has achieved a degree of public recognition and renown. The resolution of this factor favors opposer.

(6) The number and nature of similar marks in use on similar goods.

Applicant has not made of record any evidence that there are similar marks in use on similar goods. Opposer has testified that it is unaware of any use of TORO on equipment, machinery, or computer-related products or parts. St. Dennis dep. at 13. Therefore, this factor is resolved in opposer's favor.

(7) The nature and extent of any actual confusion.

Inasmuch as applicant has not used its mark (Cohen dep. at 23), there can be no evidence of actual confusion and this factor does not favor either party.

(8) The length of time during and conditions under which there has been concurrent use without evidence of actual confusion.

Because applicant has not used its mark (Cohen dep. at 23), there is no period of time of concurrent use and, therefore, this factor does not favor either party.

(9) The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark).

Applicant has indicated an intent to use its mark on a single product, thin film heads. Although opposer has used the TORO mark on a number of products and services, they are primarily goods and services related to lawn and ground care and maintenance. Opposer has obtained 26 registrations for the word TORO in a typed drawing or

stylized letters or with a simple design for these

products and services.  These products and services, as

opposer has admitted, are purchased by homeowners,

outdoor facilities managers, and agricultural interests.

St. Dennis dep. at 8 – 9.  Because opposer's goods and

services are primarily for lawn and ground care, the mark

is not used on a wide range of goods and services.

Moreover, all of applicant's goods and services are

distinct from applicant's identified goods. Accordingly,

the resolution of this issue favors opposer only

slightly.

> (10) The market interface between applicant and the
> owner of a prior mark:
>
> (a)  a mere "consent" to register or use.
> (b) agreement provisions designed to preclude
> confusion, i.e. limitations on continued use of
> the marks by each party.
> (c) assignment of mark, application,
> registration and good will of the related
> business.
> (d) laches and estoppel attributable to owner of
> prior mark and indicative of lack of confusion.

This factor is not an issue in this case.

> (11) The extent to which applicant has a right to
> exclude others from use of its mark on its
> goods.

There is no evidence on this factor.

> (12) The extent of potential confusion, i.e., whether
> de minimis or substantial.

Because of the sophistication of the purchasers, the highly technical nature of applicant's goods, and the limited number of potential purchasers, the extent of potential confusion is slight, and the resolution of this factor favors applicant.

(13) Any other established fact probative of the effect of use.

Other than opposer's assertion that it vigorously enforces its trademark rights and the list of oppositions it initiated without any indication of the results (Exhibit 41, p. 17)[4], there is little evidence on this factor.

No Likelihood of Confusion

We now balance the du Pont factors and conclude that there is no likelihood of confusion in this case. Likelihood of confusion is decided upon the facts of each case. Dixie Restaurants, 105 F.3d at 1406, 41 USPQ2d at 1533; Shell Oil, 992 F.2d at 1206, 26 USPQ at 1688. The

_____

[4] We note that Toro has met with mixed success at the CCPA and at this Board. Falk Corp. v. Toro Mfg. Corp., 493 F.2d 1372, 181 USPQ 462 (CCPA 1974) (TORO not confusingly similar to TORUS); Toro Co. v. Hardigg Industries, 549 F.2d 785, 193 USPQ 149 (CCPA 1977)(Res judicata issue; Hardigg not permitted to reopen question of confusing similarity by changing its identification of goods); Toro Manufacturing Corp. v. Gleason Works, 475 F.2d 643, 177 USPQ 330 (CCPA 1973) (TORO not confusingly similar to TOROID for gears); Toro Company v.

19

various factors may play more or less weighty roles in any particular determination of likelihood of confusion. Id.; du Pont, 476 F.2d at 1361, 177 USPQ at 567.

On the one hand, opposer's and applicant's marks are similar in appearance and sound, and opposer's mark has achieved a degree of public recognition and renown for goods and services related to lawn and ground care and maintenance, and it may, therefore, be considered a strong mark. On the other hand, there are differences in the goods and services, the purchasers and the channels of trade. Applicant's purchasers would be highly sophisticated purchasers who would exercise great care when purchasing thin film heads. All of these factors persuade us that there is no likelihood of confusion in this case. We arrive at this conclusion mindful of the requirement that a long

established principle of trademark law requires us to resolve doubts about confusion against the newcomer. Kenner

Parker Toys, 963 F.2d at 355, 22 USPQ2d at 1458. In addition, we have weighed the evidence of the public recognition and renown of opposer's mark as a significant factor in opposer's favor because the Federal Circuit

Fleetwood Enterprises, 185 USPQ 828 (TTAB 1975) (TORO not

20

"has acknowledged that fame of the prior mark, another du Pont factor, 'plays a dominant role in cases featuring a famous or strong mark.'" Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 877, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992), quoting, Kenner Parker Toys, 963 F.2d at 352, 22 USPQ2d at 1456. "Famous marks thus enjoy a wide latitude of legal protection." Recot, Inc. v. Becton, 214 F.3d 1322, 1327, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000) (FIDO LAY for edible dog treats confusingly similar to FRITO-LAY snack foods).

Here, applicant is applying to register a mark that is similar, but not identical, to opposer's marks. However, applicant's goods are very specific parts of hard drives that are sold to original equipment manufacturers of high performance computer disk drives. Purchasers of applicant's goods and of opposer's computer-related products and services would not overlap.

For opposer's other products, original equipment manufacturers of high performance computer hard drives are not likely to believe that thin film heads for hard drives are somehow associated with opposer. It is difficult even to see any overlap between purchasers of applicant's thin film heads and opposer's lawn mowers,

_____

confusingly similar to TAURUS).

irrigation systems, blower vacuums, string trimmers, and other similar products and services.  See Electronic Design & Sales, 954 F.2d at 719, 21 USPQ2d at 1392-93 ("[O]pposer urges that persons who use opposer's data processing and telecommunications services at work and who buy batteries at retail stores would be confused as to source .... [T]he potential for confusion appears a mere possibility not a probability").  Similarly, we hold that there is no likelihood of confusion between applicant's mark and opposer's marks when used on the identified goods and services in the application and registrations.[5]

---

[5] Opposer has amended its notice of opposition to claim that there is also a likelihood of confusion between the applicant's mark "ToroMR" and design and opposer's use of its registered mark TORO with the term MIR.  Opposer alleges it uses this term in advertising for its computerized satellite controllers for its irrigation systems.  Amended Notice of Opposition, p. 2, ¶ 6.  Opposer claims that MIR stands for "Motorola Infrared Regulation."  St. Dennis dep. at p. 49.  Motorola apparently manufactures the computer and satellite components for opposer's satellite-controlled irrigation system.  Exhibit No. 35, p. 2.  Applicant has not objected to this amendment.  However, opposer has introduced no evidence to show that this common law mark TORO MIR was in use prior to the filing date of applicant's intent-to-use application.  Therefore, opposer cannot prevail on its claim of likelihood of confusion with its asserted common law mark.  Miller Brewing Co. v. Anheuser-Busch, Inc., 27 USPQ2d 1711, 1714 (TTAB 1993).  Even if opposer established priority, there would be no likelihood of confusion between opposer's components for its satellite-controlled irrigation systems and

### Dilution

In the Trademark Amendments Act of 1999 (TAA), Congress provided that opposition and cancellation proceedings may be based on claims of dilution. See 15 U.S.C. §§ 1063(a) and 1064. We now turn to opposer's claim that applicant's mark dilutes its famous trademark.

#### Opposer's Motion to Amend the Notice of Opposition

On March 3, 2000, opposer's testimony period began and, on March 9, 2000, the deposition of opposer's only witness was taken. On March 27, 2000, opposer filed, as noted earlier, a motion to amend its notice of opposition, in relevant part, to allege that applicant's use of the mark "ToroMR" and design would dilute its famous TORO marks. No opposition was filed by applicant to opposer's "Motion to Amend Notice of Opposition." Opposer's testimony period closed on April 1, 2000.

Applicant's testimony period began May 2, 2000, and it took the deposition of its only witness on May 11, 2000. Applicant's testimony period closed on May 31, 2000. As stated earlier, on July 19, 2000, the Board in accordance with its usual practice entered an order, inter alia, deferring a decision on opposer's motion to amend its notice of opposition until final hearing. See

applicant's thin film heads because the potential purchasers and

Devries v. NCC Corp., 227 USPQ 705, 708 n.7 (TTAB 1985); TBMP § 507.03(b).  Opposer in its brief argues that "Applicant's mark dilutes Toro's famous mark" (p. 18). Applicant in its brief argues on the merits that its mark "will not dilute Opposer's mark" (p. 19).  In its reply brief, opposer notes that "Applicant has not objected to the admission of the Amended Notice of Opposition" (p. 3).

"A notice of opposition or petition for cancellation filed before enactment of the Trademark Amendments Act may, assuming no prejudice to the defending applicant or registrant, be amended to add a claim of dilution, so long as the involved application or registration was filed on or after January 16, 1996."  Polaris Industries v. DC Comics, 59 USPQ2d 1798, 1800 (TTAB 2000); Boral Ltd. V. FMC Corp., 59 USPQ2d 1701, 1703 (TTAB 2000). Applicant's intent-to-use application was filed on October 14, 1997, more than one year after the Federal Trademark Dilution Act of 1995 (FTDA) became effective. Pub. L. No. 104-98, 109 Stat. 985.  Applicant filed no paper in opposition to opposer's motion to amend the notice of opposition.  Trademark Rule 2.127(a) provides that the Board may treat a motion as conceded if no

---

the channels of trade are distinct.

24

response is filed.  Motions to amend pleadings in inter partes cases are governed by Federal Rule of Civil Procedure 15.  Trademark Rules 2.107, 2.115, and 2.116(a).  Motions to amend pleadings are liberally granted unless the amendment would violate settled law or be prejudicial to another party.  Commodore Electronics v. CBM Kabushiki Kaisha, 26 USPQ2d 1503 (TTAB 1993).  Here, applicant has not raised any objection to the Amended Notice of Opposition, it has responded to the dilution claim on the merits in its brief, and it has not raised any claim of prejudice by the dilution ground.  We are also unaware of any prejudice to applicant or any other reason not to grant the motion to amend the notice of opposition.  Inasmuch as this opposition was also tried as if the dilution claim was present, that fact also supports granting opposer's motion.  Therefore, we have granted the motion to amend.  Fed. R. Civ. P. 15(b); Colony Foods v. Sagemark, Ltd., 735 F.2d 1336, 222 USPQ 185 (Fed. Cir. 1984).

Opposer's and Applicant's Dilution Arguments

In its Amended Notice of Opposition, opposer alleges that its mark is famous and became famous prior to applicant's first use of its mark, "ToroMR" and design, and that use of applicant's mark is likely to dilute the

distinctive quality of opposer's famous mark TORO (p. 5).

In its brief, opposer alleges that applicant's mark dilutes opposer's mark because opposer's mark has acquired considerable fame through extensive sales, advertising and promotion, and it is recognized by consumers as indicating the leading producer of landscape irrigation, fertigation and beautification systems (p. 18).  Further, opposer argues that the use of applicant's mark "ToroMR" will blur the distinctiveness of opposer's famous TORO mark.

> The TORO mark has gained national and international fame by the prominent use of TORO equipment at the top national and international professional arenas, as well as Toro's advertisements at many prominent outdoor sporting events.  Toro has furthered the recognition of the TORO mark by its national and international promotional and marketing efforts.

Opposer's Br., pp. 18 – 19 (citations omitted).

In addition, opposer maintains that it vigorously enforces its trademark rights to prevent the dilution of its mark.

In response, applicant argues that opposer has not proven that its mark is distinctive, that opposer has alleged fame in a specialized market that is different

from applicant's market, and that the customers are sophisticated.[6]

Opposer responds by, inter alia, arguing that the goods of the parties are related, that its mark is famous, and that it submitted numerous copies of promotional materials to support the distinctiveness of the mark (p. 2).

The Statute

The Federal Trademark Dilution Act of 1995 (FTDA) provides that:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1).

The FTDA defines "dilution" as:

> the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of –
>     (1) competition between the owner of the famous mark and other parties, or
>     (2) likelihood of confusion, mistake, or deception.

---

[6] Applicant also argues that opposer's settlement offer impeaches opposer's claim that it vigorously defends its TORO marks.  Applicant's reliance on an alleged settlement offer by opposer is inexcusable and will not be given any consideration. See Federal Rule of Evidence 408.

15 U.S.C. § 1127.

Board cancellation and opposition proceedings are not exactly parallel to federal district court trademark infringement proceedings inasmuch as there are no alleged infringers and frequently no use by the applicants in Board proceedings. In a *court proceeding*, in order for an owner of an allegedly famous mark to prove its claim of dilution, it must provide sufficient evidence that

    (1) the other party's use is in commerce,

    (2) the other party adopted its mark after the

        plaintiff's mark became famous,

    (3) the mark is famous, and

    (4) the other party diluted the mark.

Syndicate Sales Inc. v. Hampshire Paper Corp., 192 F.3d 633, 639, 52 USPQ2d 1035, 1039-40 (7th Cir. 1999); Hasbro, 66 F. Supp.2d at 130, 52 USPQ2d at 1412. Some courts add a fifth factor: Is the mark distinctive? Nabisco, Inc. v. PF Brands Inc., 191 F.3d 208, 215, 51 USPQ2d 1882, 1886 (2d Cir. 1999). We will analyze these five factors to determine how they apply to Board proceedings and specifically to the facts of this case.

Before we begin our analysis of the facts in this particular case, we note that courts have held that dilution is an "extraordinary remedy." Advantage Rent-A-

Car Inc. v. Enterprise Rent-A-Car Co., 238 F.3d 378, 381, 57 USPQ2d 1561, 1563 (5th Cir. 2001). "[W]e simply cannot believe that, as a general proposition, Congress could have intended, without making its intention to do so perfectly clear, to create property rights in gross, unlimited in time (via injunction), even in 'famous' trademarks." Ringling Bros.-Barnum & Bailey Combined Shows v. Utah Division of Travel Development, 170 F.3d 449, 459, 50 USPQ2d 1065, 1073 (4th Cir. 1999). See also Nabisco, 191 F.3d at 224 n.6, 51 USPQ2d at 1894 n.6 (quotation marks omitted)("We agree that the dilution statutes do not prohibit all use of a distinctive mark that the owners prefer not be made .... [W]e agree with the Fourth Circuit that the dilution statutes do not create a 'property right in gross'"); I.P. Lund, 163 F.3d at 47, 49 USPQ2d at 1239 ("[T]he standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection"). In light of the above guidance, we start by noting that, unlike in likelihood of confusion cases, we will not resolve doubts in favor of the party claiming dilution.

First Dilution Factor:
The Other Party's Use Is in Commerce

We begin our discussion with the factor that requires that the use alleged to dilute a mark be commercial and in commerce. 15 U.S.C. § 1125(c)(1). In this case, applicant has not used its mark in commerce (Cohen dep. at 23). We must, therefore, consider whether a dilution claim can be raised against an application that is based on an intent to use the mark in commerce.

Trademark applications may be filed based on an intent to use a mark in commerce. 15 U.S.C. § 1051(b)(1). Such applications are often published for opposition prior to the applicant's using the mark in commerce. Thus, many opposition proceedings involve marks that are not actually used. If marks based on an intent to use could not be opposed on the ground of dilution, the intent of Congress to provide for the "[r]esolution of the dilution issue before the Board, as opposed to the Federal District Court, [and thereby] result in more timely, economical, and expeditious decisions" would be frustrated. H.R. REP. No. 106-250, at 5 (1999). To require actual use by the applicant before a dilution claim could be recognized at the Board would, practically speaking, result in most dilution claims being brought as cancellation proceedings or in district court. Since the Board cannot issue

30

injunctions, once a party has begun using the mark in commerce, it is much more likely that the focus will shift to the Federal courts.  This would defeat the articulated purpose of the TAA.  Therefore, we hold that an application based on an intent to use the mark in commerce satisfies the commerce requirement of the FTDA for proceedings before the Board.[7]

Second Dilution Factor:
The Other Party Adopted its Mark
After the Plaintiff's Mark Became Famous

Here, we must determine the point at which opposer's mark must be famous vis-à-vis when the applicant adopted or used its mark.  As we explained above, many opposition

---

[7] We are aware of the split in the Circuit Courts on the issue of whether actual dilution must be shown by the plaintiff to prevail in a district court case involving a dilution claim. Compare Ringling Bros.-Barnum & Bailey Combined Shows Inc. v. Utah Division of Travel and Development, 170 F.3d 449, 50 USPQ2d 1065 (4th Cir. 1999) and Westchester Media v. PRL USA Holdings Inc., 214 F.3d 658, 55 USPQ2d 1225 (5th Cir. 2000) (actual dilution required) with Nabisco (2d Cir.) and Eli Lilly & Co. v. Natural Answers Inc., 233 F.3d 456, 56 USPQ2d 1942 (7th Cir. 2000) (actual dilution not required).  This question is irrelevant to our determination here.  The legislative history shows that Congress intended to set up a dilution proceeding at the Board in which an owner of a famous mark could prevail "before dilution type damage has been suffered in the marketplace by the owner of a famous mark."  H.R. REP. No. 106-250, at 5 – 6 (1999).  If we interpreted the TAA in a wooden manner, most owners of famous marks would not be able bring dilution claims at the Board against an application based on an intent to use or even limited actual use.  See, e.g., Federal Express Corp. v. Federal Espresso Inc., 201 F.3d 168, 53 USPQ2d 1345 (2d Cir. 2000) (No injunctive relief available when there was a tiny overlap of customers of plaintiff's delivery service and defendant's coffee shops). Such an interpretation would render the TAA virtually meaningless.

31

proceedings in which dilution claims are likely to be raised will involve intent-to-use applications. Since there is no actual use at all in these cases, the question is: By what date must an owner of an allegedly famous mark prove that its mark has become famous? There are two potential answers: the filing date of the intent-to-use application or at the time of trial.[8]

We hold that in the case of an intent-to-use application, an owner of an allegedly famous mark must establish that its mark had become famous prior to the filing date of the trademark application or registration against which it intends to file an opposition or cancellation proceeding.[9]

The FTDA provides for injunctions against "another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous." 15 U.S.C. § 1125(c)(1). The constructive use provisions of the Trademark Act establish that:

> Contingent on the registration of a mark on the principal register provided by this Act, the filing of the application to register shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect ... against any other

---

[8] This analysis assumes that the intent-to-use applicant has not actually used the mark in commerce.

[9] In a use-based application under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), the party alleging fame must show that the mark had become famous prior to the applicant's use of the mark.

32

person except for a person ... who, prior to such filing (1) has used the mark.

15 U.S.C. § 1057(c).

To harmonize the constructive use provisions with the Board's authority to resolve dilution issues, it would appear that an owner of an allegedly famous mark would have to show fame prior to the constructive use date; otherwise the intent-to-use provisions would lose much of their value. Accord <u>WarnerVision Entertainment, Inc. v. Empire Of Carolina Inc.</u>, 101 F.3d 259, 262, 40 USPQ2d 1855, 1857 (2d Cir. 1996)("[A]s long as an ITU applicant's privilege has not expired, a court may not enjoin it from making the use necessary for registration on the grounds that another party has used the mark subsequent to the filing of the ITU application. To permit such an injunction would eviscerate the ITU provisions and defeat their very purpose"). In the same way, if an owner of a mark that was not famous prior to an intent-to-use application's filing date could bring a dilution claim, it would undermine the purposes of the Federal Trademark Law Revision Act of 1988 (TLRA). The purposes of the intent-to-use amendments to the Trademark Act were (1) to

harmonize United States practice with foreign practice by permitting U.S. applicants to obtain a determination of the registrability of their marks without expending the energy and resources needed to begin using the mark, and (2) to eliminate the token use practice that had developed because of the use requirements of American trademark law.  See S. REP. No. 101-515, 100th Cong., 2d Sess. (1988) set out in 6 McCarthy on Trademarks and Unfair Competition (4th ed.):

> This disparity between U.S. law and that of most other countries results in foreign applicants having an advantage over U.S. applicants in obtaining trademark registration rights. (p. App. A5-8).
>
> The Lanham Act's preapplication use requirement also creates unnecessary legal uncertainties for a U.S. business planning to introduce products or services into the marketplace.  It simply has no assurance that after selecting and adopting a mark, and possibly making a sizeable investment in packaging, advertising and marketing, it will not learn that its use of the mark infringes the rights another acquired through earlier use. (p. App. A5-9).
>
> Token use is a contrived and commercially transparent practice – nothing more than a legal fiction ....   [T]oken use becomes unnecessary and inappropriate under the intent-to-use application system. (pp. App. A5-9 – A5-10).

If intent-to-use applications do not receive the benefit of their constructive use date for purposes of dilution, applicants will be discouraged from filing intent-to-use applications and encouraged to make token use of their marks to protect them from non-famous marks

34

that acquire fame while their applications are pending. We see no indication either in the language or legislative history of the FTDA or TAA that Congress intended this result that is so at odds with the TLRA.

Our interpretation of the Trademark Act as amended by the FTDA, TAA, and the intent-to-use provisions would maintain this status quo. The owner of a non-famous mark in use prior to a constructive use date of an intent-to-use applicant's mark would be able to oppose the registration of the application based on likelihood of confusion. However, it could not base a dilution claim in an opposition on fame acquired after the applicant's filing date.

In this case, applicant has not questioned opposer's evidence, much of which is dated after the filing date of applicant's intent-to-use application. Also, both parties have conducted this opposition without any guidance from the Board as to what the critical date for establishing fame is. Here, we ultimately hold that opposer's mark has not been diluted. Our opinion would not change whether we considered only the pre-application filing date evidence or all the evidence. Because it does not affect the outcome, we will not attempt to determine what, if any, evidence is dated prior to

35

applicant's filing date.  Therefore, we will discuss all the evidence.

Third Dilution Factor:
Fame and Distinctiveness

We will consider the fame and distinctiveness of a mark at the same time.  The FTDA has set out a non-exclusive list of factors that should be considered when determining whether a mark is famous and, thus, is the type of mark for which a claim of dilution is possible.[10]  We apply a rigorous test to determine the fame and distinctiveness of a mark.  Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 876, 51 USPQ2d 1801, 1806 (9th Cir. 1999), quoting, S. REP. No. 100-515, at 42 (FTDA applies 'only to those marks which are both truly distinctive *and* famous'").

> In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to –
> (A)  the degree of inherent or acquired distinctiveness of the mark;
> (B)  the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
> (C)  the duration and extent of advertising and publicity of the mark;
> (D)  the geographical extent of the trading area in which the mark is used;

---

[10] There appears to be considerable overlap between the evidence that would support each of the factors, particularly the evidence supporting the degree of inherent and acquired distinctiveness (Factor A) and the other factors, such as the degree of recognition in trading areas (Factor F) and the duration and extent of use and advertising (Factors B and C).

36

> (E)  the channels of trade for the goods or
>       services with which the mark is used;
> (F)  the degree of recognition of the mark in
>       the
>       trading areas and channels of trade used by
>       the mark's owner and the person against
>       whom the injunction is sought;
> (G)  the nature and extent of use of the same or
>       similar marks by third parties; and
> (H)  whether the mark was registered under the
>       Act of March 3, 1881, or the Act of
>       February 20, 1905, or on the principal
>       register.

15 U.S.C. § 1125(c)(1).

We analyze these factors to determine whether opposer's TORO mark is distinctive and famous as required by the FTDA, as opposed to simply a mark that has acquired a degree of public recognition and renown as indicated in the 5th factor of the du Pont case for trademark likelihood of confusion analysis.

A.  The Degree of Inherent or Acquired
    Distinctiveness of the Mark

Here, we look at the degree to which a mark alleged to be famous is distinctive.  This requires us to look at how "unique" the term is to the public.  The simple distinctiveness under Section 2(f) required for registration on the Principal Register is not the test for whether a mark is distinctive and a famous mark under § 43(c).  Avery Dennison, 189 F.3d at 877, 51 USPQ2d at

37

1807; Washington Speakers Bureau Inc. v. Leading Authorities Inc., 33 F. Supp.2d 488, 502, 49 USPQ2d 1893, 1905 (E.D. Va. 1999) ("[C]ourts have uniformly held that to be capable of being diluted, a mark must have a degree of distinctiveness and 'strength' beyond that needed to serve as a trademark") (citation and interior quotes omitted), aff'd without published opinion, 217 F.3d 843 (4th Cir. 2000).

> [D]istinctiveness plays a dual role. First, as discussed above, it is a statutory element. A mark cannot qualify for protection unless it is distinctive. Second, the *degree* of distinctiveness of the senior mark has a considerable bearing on the question whether the junior use will have a diluting effect. As the distinctiveness of the mark is the quality that the statute endeavors to protect, the more distinctiveness the mark possesses, the greater the interest to be protected.

Nabisco, 191 F.3d at 217, 51 USPQ2d at 1888.

While we agree with those courts that hold that the term "distinctive" is not a synonym for the word "famous"[11], it does not appear that the outcome of those dilution cases turned on the courts' considering distinctiveness to be a separate factor. Therefore, our decision to find that distinctiveness and fame are separate concepts is based on the ordinary rules of

---

[11] Other courts have found it is not a separate requirement. Times Mirror Magazines Inc. v. Las Vegas Sports News L.L.C., 212 F.3d 157, 167, 54 USPQ2d 1577, 1584 (3rd Cir. 2000) ("[W]e are

38

statutory construction that require us to presume that Congress did not use redundant language in legislation, and that we should attempt to give meaning to all the language Congress used. Platt v. Union Pacific Railroad, 99 U.S. 48, 58 (1878) (Legislature is presumed to have "used no superfluous words"); Bailey v. United States, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, non-superfluous meaning"). That is particularly the case here where the words do seem to have non-identical meanings.

Such an interpretation of the statute makes sense. To be vulnerable to dilution, a mark must be not only famous, but also so distinctive that the public would associate the term with the owner of the famous mark even when it encounters the term apart from the owner's goods or services, i.e., devoid of its trademark context. H.R. REP. No. 104-374, at 3 (1995) ("the mark signifies something unique, singular, or particular"). Also, courts have indicated that a mark can be famous but not particularly distinctive. See, e.g., Sporty's Farm L.L.C. v. Sportsman's Market Inc., 202 F.3d 489, 497, 53

not persuaded that a mark be subject to separate tests for fame

39

USPQ2d 1570, 1576 (2d Cir. 2000) ("[E]ven a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness"); TCPIP Holding Co. v. Haar Communications Inc., 244 F.3d 88, 96, 57 USPQ2d 1971, 1975 (2d Cir. 2001) (footnote omitted) ("Some of the holders of these inherently weak marks are huge companies; as a function of their commercial dominance their marks have become famous.  It seems unlikely that Congress could have intended that the holders of such non-distinctive marks would be entitled to exclusivity for them throughout all areas of commerce").  Also, a mark can be a famous mark in a particular field but not be distinctive outside that field.  If the same mark is used by others on a wide variety of unrelated products, the mark may be famous for a particular item but not very distinctive.  See Syndicate Sales, 192 F.3d at 640, 52 USPQ2d at 1041 ("For example, a mark may be highly distinctive among purchasers of a particular type of product").  Thus, the more tenuous the connection between the mark by itself and a single source, the less likely that the mark is truly famous and distinctive.

If the owner of a mark claiming dilution cannot establish a direct and immediate connection between the

---

and distinctiveness").

mark and itself because the mark is not very distinctive, the less likely dilution can be proven.  The mark CLUE may have significant recognition and renown to the extent that purchasers of board games would be very familiar with it.  But it was found to be not very distinctive in the marketplace in general.  Hasbro, 66 F. Supp.2d at 131, 52 USPQ2d at 1413 ("Clue" found to be a common word with many meanings and "defendant's use of the word 'clue' is entirely consistent with the common usage of the word").

Thus, we view fame and distinctiveness as two overlapping, but slightly different, concepts.  Since marks can be famous in a particular area as well as across a broad spectrum, we look to the degree of distinctiveness to determine the degree of fame.  If a term has achieved fame, but the evidence of distinctiveness indicates that there are numerous other uses of the term, the fame of the mark may be limited. Hasbro, 66 F. Supp.2d at 132, 52 USPQ2d at 1413-14 ("[M]arks consisting of relatively common terms and with use of the same terms by third parties ... not sufficiently famous to warrant FTDA protection"). Therefore, in addition to looking at whether a mark is inherently distinctive, we will also look at the degree

of distinctiveness a mark alleged to be famous has acquired.  See <u>Citigroup Inc. v. City Holding Co.</u>, No. 99 Civ. 10115, 2001 U.S. Dist. LEXIS 17653, at *20 (S.D.N.Y. November 1, 2001) ("In addition to inherent distinctiveness, the CITI family of marks has, through extensive advertising and promotion over the decades, garnered extraordinary acquired distinctiveness").

   In this case, the TORO mark is inherently distinctive for purposes of registration on the Principal Register.  It is registered on the Principal Register without any claim of acquired distinctiveness.[12] Nonetheless, both parties admit that the term "toro" means "bull."  Cohen dep. p. 23; St. Dennis dep. at 14. The term "toro" is not a coined word, most especially to the millions of purchasers in America who are familiar with the Spanish language.  Indeed, there is some indication that the term "toro" has entered the English language. *Webster's Third New World Dictionary of the English Language Unabridged* (1993) 2412 ("toro – 1.

---

[12] The fact that a mark is registered on the Principal Register would favor the party claiming that the mark is famous.  <u>Las Vegas Sports News</u>, 212 F.3d at 166, 54 USPQ2d at 1583 (FTDA Fame Factor H).  Failure to register may be a factor counted against a party claiming that the mark is famous.  <u>Washington Speakers</u>, 33 F. Supp.2d at 504, 49 USPQ2d at 1907.

42

Chiefly Southwest: BULL").[13] While the term "toro" or "bull" may have some suggestive connotations of strength, it does not appear to have any specific meaning in relation to opposer's products and services. Opposer's witness testified that no one making machinery, computer-related products, or computer-related parts uses the mark TORO. St. Dennis dep. at 13. Although applicant has put in no evidence of third-party usage, its witness asserted that: "'toro' comes from the toroidal head. In the patents, we already refer to our heads as toroidal heads; and this is the particular shape of the head." Cohen dep. at 11.

In this case, while opposer has provided some evidence as to the distinctiveness of its mark, there is no direct evidence of consumer recognition of the mark as pointing uniquely to opposer. Also, there is evidence that "toro" is not a coined word, and that it has a suggestive meaning with respect to applicant's goods.

B.  The Other Fame Factors

Opposer has submitted evidence that indicates it has used its mark TORO since 1914; that it has 3000 dealers worldwide, including approximately 2500 in the United

---

[13] We take judicial notice of this definition. University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., 213 USPQ

States; that it has annual sales of $1.3 billion; and that

it uses its mark TORO on all its products and services.

St. Dennis dep. at 12, 33, 43, 44, and 49. Opposer's

goods and services are described as "a wide variety of

professional lawn mowers and consumer lawn mowers,

irrigation systems, computerized irrigation controllers,

vehicles, work vehicles, string equipment, blower

vacuums, trimmers, string trimmers." St. Dennis dep. at

15.

In addition, opposer's witness has testified that

TORO is often the dominant brand in its various markets.

> Well, it's the number one brand in just about every
> market in which we compete. It's, for example, in
> the golf business, 75 out of the top 100 courses,
> for example, are TORO courses using TORO equipment
> and TORO irrigation. In the sports field, for
> example, we probably have 80 percent of the NFL and
> major league baseball stadiums. That type of
> awareness is representative of the brand awareness
> in the professional and the consumer market.

St. Dennis dep. at 8.

Mr. St. Dennis goes on to report that TORO equipment

was used at the Ryder Cup in golf (p. 9); that opposer

spends $35 – 40 million on advertising annually (p. 49),

and that approximately 66% of its revenue is derived from

sales to professionals and the remainder from sales to

---

594, 596 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed.

residential homeowners (p. 11). The record contains numerous brochures and a videotape of television commercials that opposer uses to promote its products and services. Finally, opposer submitted testimony that it advertises in a variety of publications, including newspapers such as <u>Los Angeles Times</u>, national publications such as <u>Better Homes and Gardens</u>, and state and city magazines such as <u>Minneapolis-St. Paul Magazine</u>. St. Dennis dep. at 43. Applicant has not submitted any evidence to contradict opposer's evidence of fame.[14]

We now apply this evidence to the factors concerning the duration and extent of use (FTDA Fame Factor B) and advertising (Factor C) and the channels of trade for opposer's goods and services (Factor E). "With respect to the duration and extent of use, generally a famous mark will have been in use for some time." H.R. REP. No. 104-374, at 7 (1995). Opposer has used its mark for years on a wide variety of lawn care, landscaping, irrigation and similar products and services. Its sales,

---

Cir. 1983).

[14] Applicant's president did testify that he was not familiar with the TORO mark. Cohen dep. at 12 (Question: "When you chose that name [ToroHead] were you aware of the Toro mark or marks of The Toro Company?" Answer: "No, I was not.").

though not set out by category of products and services, are substantial.

Similarly, it is not contested that opposer has advertised its products and services in different types of publications and media. "Toro spends $35 – 40 million on annual advertising." (St. Dennis dep. at 49). However, there is no breakdown of advertising figures by products and services or by type of media.

Opposer's evidence of duration and extent of use and advertising is the type of evidence that would help establish that a mark is a strong mark for likelihood of confusion purposes or to show fame in a niche market, but it is much less persuasive to establish that its mark is truly famous and distinctive and entitled to the broad scope of protection provided by the FTDA. As discussed more fully below, opposer cannot prevail unless it can establish that the TORO mark is a mark that is entitled to this type of FTDA protection.

We also look at the geographic extent of its trading areas (FTDA Fame Factor D), and its recognition in its trading areas (Factor F). As to the geographic trading areas, the legislative history points out: "The

46

geographic fame of the mark [Factor D] must extend throughout a substantial portion of the U.S."  H.R. REP. No. 104-374, at 7 (1995).  It is undisputed in this case that if opposer's mark is famous, it is famous throughout the United States.

Regarding Factor F, as we discussed previously, opposer's mark is used on lawn care, irrigation, landscaping and similar products and services.  Opposer has submitted evidence that would indicate that, at least with respect to professional groundskeepers of sports venues and other fields, opposer has achieved recognition through its dominance in the field and through its association with golf courses, golf tournaments, and major league sporting events.  But there is little evidence of opposer's fame among applicant's potential customers.  These customers would be original equipment manufacturers of high performance computer disk drives that purchase thin film heads.

C.  Is Opposer's Mark Famous?

We must now consider, based on the factors discussed above, whether opposer's TORO mark is famous for FTDA purposes.[15]  Opposer's mark has achieved some

---

[15] Relying on the panel decision in Anastasoff v. United States, 223 F.3d 898 (8th Cir. 2000), opposer has asked the Board to consider a non-precedential Board decision involving its

distinctiveness because opposer's witness has testified, and applicant has not shown otherwise, that other parties do not use the mark TORO on machinery, equipment, or computer-related products. St. Dennis dep. at 13. Also, there is no indication that opposer's use thereof is anything but national in scope. It has 26 Federal registrations, it has spent considerable sums on advertising, and it has made substantial sales of a variety of goods and services in the lawn care, irrigation, landscaping, and similar fields. At least regarding professional groundskeepers and others involved with maintaining sports fields or other fields, it has demonstrated considerable recognition of its TORO mark.

However, it has presented little evidence of widespread recognition outside its specific trading fields. We find that the recognition of the TORO mark among professional groundskeepers does not equate to recognition among ordinary consumers. There is little evidence that any significant number of people attending golfing or other sporting events would even be aware of

---

litigation with a different party and the fame of its mark. Subsequently, the Anastasoff panel decision was vacated. 235 F.3d 1054 (8th Cir. 2000) (en banc) (nonprecedential). Therefore, we will not consider the nonprecedential Board decision referred to by opposer. See General Mills Inc. v. Health Valley Foods, 24 USPQ2d 1270 (TTAB 1992); In re American Olean Tile Co., 1 USPQ2d 1823 (TTAB 1986).

the TORO mark, other than if they checked a website or saw a display at the event. St. Dennis dep. at 9-10 (At the Ryder Cup golf tournament, "there is widespread use of the TORO logo ... and we were on their web site throughout the duration of the Ryder Cup"). We have no indication of how many people are aware of this association between opposer and the sporting event, or of how this association increased the TORO mark's distinctiveness in the minds of prospective purchasers. Traditionally, identical marks owned by different parties have been able to co-exist when they are used on unrelated products. Even if, as opposer asserts (Br. at 4), its lawn care products are leading brands, this fact does not establish that the mark is truly famous, such that when the public encounters the mark on unrelated goods, this use would immediately call to mind opposer's mark. We have little evidence of how famous the mark is among potential purchasers of opposer's consumer products beyond evidence relating to advertising and sales figures. Finally, we have no evidence that purchasers of thin film heads are also potential purchasers of opposer's goods and services or are even familiar with opposer's mark.

We conclude that while opposer has established that its mark has achieved some public recognition and renown, the record does not contain the evidence needed to demonstrate that the mark is a member of the "select class of marks – those with such powerful consumer associations that even non-competing uses can impinge on their value."  Avery Dennison, 189 F.3d at 875, 51 USPQ2d at 1805.  Fame for FTDA purposes cannot be shown with general advertising and sales figures and unsupported assertions of fame by the party.

> Avery Dennison argues that evidence of extensive advertising and sales, international operations, and consumer awareness suffices to establish fame.  We agree that the remaining four statutory factors in the famousness inquiry support Avery Dennison's position.  Both "Avery" and "Dennison" have been used as trademarks for large fractions of a century and registered for decades.  Avery Dennison expends substantial sums annually advertising each mark with some presumable degree of success due to Avery Dennison's significant volume of sales.  In addition, Avery Dennison markets its goods internationally.  See 15 U.S.C. Section 1125(c)(B)-(D), (G).  However, we disagree that Avery Dennison's showing establishes fame.

Avery Dennison, 189 F.3d at 878-79, 51 USPQ2d at 1808.

See also In re Pennzoil Products Co., 20 USPQ2d 1753, 1760 (TTAB 1991) (No link established between substantial sales and advertising figures and public recognition of the trademark significance of the applicant's mark).

While the eight statutory factors are a guide to determine whether a mark is famous, ultimately we must consider all the evidence to determine whether opposer has met its burden in demonstrating that the relevant public recognizes the TORO mark as "signifying something unique, singular, or particular."  H.R. REP. No. 104-374, at 3 (1995).  Because famous marks can be diluted by the use of similar marks on non-competitive goods and services, the owner of a famous mark must show that there is a powerful consumer association between the term and the owner.

In likelihood of confusion cases, a party asserting that its mark is strong frequently introduces evidence of its efforts and expenditures in promoting its products. This type of evidence is often persuasive in those cases to demonstrate that the mark has acquired public recognition and renown.  In a dilution case, this would only be the beginning of establishing that the mark is famous.  Parties claiming their marks are famous must establish conclusively that the advertising has succeeded.

Every day consumers are bombarded with hundreds, if not thousands, of advertisements for hundreds of products on television, radio, the Internet, signs, and in

publications.  A great many of these ads do not make a significant impression on the public in general.  Here, opposer has submitted evidence of the type of television ads and brochures that it has produced and the amount of money it has recently spent on advertising, but we have no evidence of how the relevant purchasers view the term. Because of the lack of such evidence, we cannot find that relevant purchasers immediately associate the term TORO with opposer and, therefore, we cannot find that it is a famous mark among the general public.  See, e.g., I.P. Lund, 163 F.3d at 47, 49 USPQ2d at 1240 (Faucet design was not famous, despite being featured and advertised in national magazines and displayed in museums).

The Second Circuit noted that an owner of an allegedly famous mark had "spent 'tens of millions of dollars' advertising its mark, but [it] does not tell ... when expended or how effectively.  Nor did [it] submit, consumer surveys, press accounts, or other evidence of fame."  TCPIP Holding, 244 F.3d at 99, 57 USPQ2d at 1978. Similarly, opposer does not provide evidence of how effective its advertising has been.

At this point, it may be useful to expand our comments and explain why a mark that has been used for such a long period of time, on a variety of products,

with a large amount of sales and advertising, has not been found to be a famous mark for FTDA purposes.

Fame for dilution purposes is difficult to prove. Advantage Rent-A-Car, 238 F.3d at 381, 57 USPQ2d at 1563 ("Enterprise did not prove that its slogan [WE'LL PICK YOU UP] was sufficiently 'famous,' even within the car rental market"). The party claiming dilution must demonstrate by the evidence that its mark is truly famous. I.P. Lund, 163 F.3d at 48, 49 USPQ2d at 1227. In effect, an owner of a famous mark is attempting to demonstrate that the English language has changed. Words can be common nouns or proper nouns, such as geographic terms or surnames. Occasionally, new words are added to the English language. Traditionally, multiple uses of a term as a trademark can co-exist when used for non-related goods and/or services. This is a bedrock principle of trademark law. With the advent of the FTDA, this traditional balance has been upset. Now, the owner of a famous mark can prohibit the use or registration of the same or substantially similar mark even on unrelated goods and/or services. However, to accomplish this successfully, the mark's owner must demonstrate that the common or proper noun uses of the term and third-party uses of the mark are now eclipsed by the owner's use of

the mark.  What was once a common noun, a surname, a simple trademark, etc., is now a term the public primarily associates with the famous mark.  To achieve this level of fame and distinctiveness, the party must demonstrate that the mark has become the principal meaning of the word.[16]  For example, the mark DUPONT was recognized as a mark that could be protected under the FTDA and would not be treated as merely a surname.  H.R. REP. No. 104-374, at 3 (1995) ("[T]he use of DUPONT shoes ... would be actionable under this legislation").  On the other hand, the plaintiff in the Hasbro case could not show that the English language had changed, and that purchasers associated the common word CLUE *in the abstract* with the producer of the board game.

Therefore, an opposer relying on the FTDA to provide the broadest protection for its mark against totally unrelated goods, as in this case, must provide evidence that when the public encounters opposer's mark in almost any context, it associates the term, at least initially, with the mark's owner.  If this were not the case, then almost any fanciful mark could easily show fame because,

---

[16] We do not attempt to fix a percentage that would establish that a mark is famous and distinctive.  See Las Vegas Sports News, 212 F.3d at 175, 54 USPQ2d at 1590 (Barry, J., dissenting) (discussing attempts by commentators to fix a specific percentage cutoff for consumer recognition).

by definition, it is a new word, even if few people recognize it. While it may be easier for a fanciful mark to crowd out other uses, it still must be shown to be famous and distinctive. Eli Lilly & Co. v. Natural Answers Inc., 233 F.3d 456, 466, 56 USPQ2d 1942, 1949 (7th Cir. 2000)("The strongest protection is reserved for fanciful marks that are purely the product of imagination and have no logical association with the product").

Examples of evidence that show the transformation of a term into a truly famous mark include:

1. Recognition by the other party. Federal Express, 201 F.3d at 177, 53 USPQ2d at 1346.

2. Intense media attention. Eli Lilly, 233 F.3d at 459 and 469, 56 USPQ2d at 1943 and 1951 (PROZAC appearing twice on the cover of Newsweek; identified in Fortune magazine as one of the top six "health and grooming products of the 20th century," subject of two bestsellers and television news and talk shows).

3. Surveys. Grupo Gigante S.A. de C.V. v. Dallo & Co., 119 F. Supp.2d 1083, 1099 (C.D. Cal. 2000) (Survey considered, but not persuasive).

Although opposer has not submitted evidence of this type, it has provided evidence that its products are the

55

overwhelming choice of top sports venues, and that it is often the dominant brand in the fields, both professional and consumer, in which it competes. While a party may be able to demonstrate that a mark is truly famous by evidence that a large percentage of the general public or the specific industry purchases the goods or services offered under the plaintiff's mark, opposer has not done that here in terms of showing fame in general. Opposer's evidence shows that its mark has achieved fame in the limited market of professional sports venues. This may be enough to demonstrate niche market fame, as discussed infra. However, many of opposer's goods are sold as general consumer products.

With respect to consumer products and services, the fact that a party's mark may have achieved fame for those particular goods and services does not establish that the mark has achieved a general fame. Merely providing evidence that a mark is a top-selling brand is insufficient to show this general fame without evidence of how many persons are purchasers.[17] There is a

---

[17] In all these cases, the questions of fame and dilution are heavily fact-dependent. Even evidence that one out of every seven households in the United States was a customer of the owner of the mark and that millions of additional households had been solicited did not result in a finding that plaintiff's CITI marks were diluted by defendant's CITY mark. Citigroup, 2001 U.S. Dist. LEXIS 17653, at *26.

difference between goods and services such as soft drinks, restaurant services, and pain relievers, which are purchased by a sizeable percentage of the general population on a regular basis,[18] and lawn movers or string trimmers, whose use and purchase are less universal. Opposer has not included any evidence of what percentage of households are customers of its products.

Obviously, we are setting no limits on the types of evidence a party can use to show fame, nor are we requiring any specific type of evidence. But in order to prevail on the ground of dilution the owner of a mark alleged to be famous must show a change has occurred in the public's perception of the term such that it is now primarily associated with the owner of the mark even when it is considered outside of the context of the owner's goods or services. In this case, although opposer has provided some evidence of sales and advertising, we cannot conclude from the evidence that the public associates the term "Toro" with opposer in nearly every context. Opposer's evidence of fame is insufficient to show that its mark is a truly famous mark.

Niche Market Fame

---

[18] Even a large, occasional purchase such as a car, which is used by the general population on a daily basis, is a different type of consumer product than applicant's goods.

The next question concerns the possibility that fame exists among a particular group. Normally, famous marks are famous to everyone. The legislative history of the FTDA gives examples of BUICK, KODAK, and DUPONT as household terms with which almost everyone is familiar. The use of these marks on very dissimilar products would give rise to a claim of dilution. Here, opposer's evidence does not establish that TORO is a famous mark among the public in general, and that the public would associate the term TORO with opposer regardless of the products or services with which the mark is used.

However, courts have come to recognize that fame in specialized markets can cause dilution. This has become known as "niche" market fame. Las Vegas Sports News, 212 F.3d at 164, 54 USPQ2d at 1581 (quoting Restatement (Third) of Unfair Competition, § 25, comment e (1995)) ("A mark that is highly distinctive only to a select class or group of purchasers may be protected from diluting uses directed at that particular class or group"); Washington Speakers, 33 F. Supp.2d at 503, 49 USPQ2d at 1906) ("[T]he language of the FTDA itself lends some support to the idea that marks famous in niche markets can be protected from diluting uses directed at the same narrow market").

Opposer seems to argue that its mark has achieved niche market fame when it alleges that: "The Toro mark is a famous mark, recognized by consumers to indicate the leading producer of landscape irrigation, fertigation, and beautification systems." Opposer's Brief at 18. This argument relies on the fame that opposer has achieved with its success in the area of golf course and other sports venue maintenance. These sales are directed to its professional customers (St. Dennis dep. at 11) and would indicate, at best, fame in a very specific area, that is, niche fame. Applicant points out that its market (selling thin film heads to original equipment manufacturers of disk drives for computers) is "far different from the specialized market segment in which the Opposer operates." Applicant's Brief at 20 - 21.

For the purpose of this discussion, we accept, without deciding, the proposition that fame in a niche market is a proper basis for alleging dilution under the FTDA. With niche market fame, a mark may achieve extraordinary fame in a particular field so that nearly everyone in that field recognizes the mark in the abstract, that is, divorced from its associated goods or services. If another party uses the mark on unrelated or related products marketed in the same field, dilution may

be possible. However, even if niche market fame could result in dilution, it does not assist opposer in this case. If a mark is not famous to purchasers at large, but only to a specific group, fame is not relevant unless somehow the goods or services with which the allegedly diluting mark is used are in the same market. Here, the specialized fields of the parties are distinct, and even if opposer's goods have achieved fame in the area of landscaping and sports venue maintenance, that fame would not be diluted by applicant's use of its mark in the field of thin film heads sold to original equipment manufacturers.

> [A] closer look indicates that the different lines of authority are addressing two different contexts. Cases holding that niche-market fame is insufficient generally address the context in which the plaintiff and defendant are using the mark in separate markets. On the other hand, cases stating that niche-market renown is a factor indicating fame address a context in which the plaintiff and defendant are using the mark in the same or related markets.

Syndicate Sales, 192 F.3d at 640, 52 USPQ2d at 1040-41 (footnotes omitted).

We have no doubt that if this opposer (or almost any opposer for that matter) defined its market narrowly enough, it would eventually be able to show fame in some limited market. However, we will not consider whether the mark has niche market fame unless the party alleging

fame has demonstrated the trading fields overlap.  Here, opposer has not done this.

Fourth Dilution Factor:<br>
<u>The Mark Will Be Diluted</u>

Under the FTDA, dilution occurs when the capacity of a famous mark to distinguish goods and services is lessened.  15 U.S.C. § 1127.  "It applies when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular."  H.R. REP. No. 104-374, at 3 (1995).  Dilution diminishes the "selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public."  <u>Sally Gee, Inc. v. Myra Hogan, Inc.</u>, 699 F.2d 621, 624-25, 217 USPQ 658, 661 (2d Cir. 1983).

Dilution can occur through blurring or tarnishment.

> Tarnishment and blurring have emerged as the two main ways by which federal courts have found dilution ....  Blurring occurs when one or more identical or similar marks are used on dissimilar products without authorization so that the distinctiveness of the famous mark is eroded.

H.R. REP. No. 106-250, at 5 (1999).

Opposer only alleges dilution by blurring in this case.  Courts have noted that blurring protects trademark owners from:

> The erosion of distinctiveness and prestige of a trademark caused by the sale of other goods or

61

services under the same name ... or simply a proliferation of borrowings that, while not degrading the original seller's mark, are so numerous as to deprive the mark of its distinctiveness and hence impact.

Illinois High School Association v. GTE Vantage, 99 F.3d 244, 247, 40 USPQ2d 1633, 1635 (7th Cir. 1996) (dicta) (parenthetical omitted).

"Dilution occurs when consumers associate a famous mark that has traditionally identified the mark holder's goods with a new and different source." Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 832, 50 USPQ2d 1047, 1051 (8th Cir. 1999). Therefore, blurring occurs when a substantial percentage of consumers, upon seeing the junior party's use of a mark on its goods, are immediately reminded of the famous mark and associate the junior party's use with the owner of the famous mark, even if they do not believe that the goods come from the famous mark's owner.

Prior to the FTDA, many courts analyzed state dilution claims under the six "Sweet" factors, named after the concurring opinion of Judge Sweet in Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., 875

62

F.2d 1065, 1035, 10 USPQ2d 1961, 1969 (2d Cir. 1989)

(Sweet, J., concurring).[19]

The Sweet factors have not been widely accepted as a test for dilution under the FTDA and we decline to apply the test here.  Ringling Bros., 170 F.3d at 464, 50 USPQ2d at 1077 (Sweet factor "analysis simply is not appropriate for assessing a claim under the federal Act"); I.P. Lund, 163 F.3d at 49, 49 USPQ2d at 1241 (Court agreed that the use of Judge Sweet's six-factor test is inappropriate); McCarthy, 24:94.2 ("[S]ince four of the six factors are of dubious relevance to a case under the 1996 federal Act, use of the six-factor test is bound to lead to erroneous results").  Factors that we will look at in determining whether dilution will occur include two of the Sweet factors (similarity of the marks and renown of the senior party, i.e., the person claiming fame) as well as whether target customers are likely to associate two different products with the mark even if they are not confused as to the different origins of these products.  Hasbro, 66 F. Supp.2d at 136, 52 USPQ2d at 1417.

---

[19] The six Sweet factors are:  (1) the similarity of the marks, (2) the similarity of the goods; (3)the sophistication of consumers; (4) predatory intent, (5) the renown of the senior mark; and (6) renown of the junior mark.  Id.

Starting first with the similarity of the marks, we note that the marks are not identical. For dilution purposes, a party must prove more than confusing similarity; it must show that the marks are identical or "very or substantially similar." Nabisco, 191 F.3d at 218, 51 USPQ2d at 1889, quoting, Mead Data, 875 F.2d at 1029, 10 USPQ2d at 1964 (majority opinion). The test for blurring is not the same as for determining whether two marks are confusingly similar for likelihood of confusion purposes. "To support an action for dilution by blurring, 'the marks must be similar enough that a significant segment of the target group sees the two marks as essentially the same.'" Luigino's, Inc., 170 F.3d at 832, 50 USPQ2d at 1051) (quoting 2 McCarthy on Trademarks and Unfair Competition, § 24:90.1 (4th ed. 1998). Therefore, differences between the marks are often significant. Mead Data (LEXUS for cars did not dilute LEXIS for database services).

While the marks TORO and "ToroMR" and design are similar, we do not find that they are substantially similar for dilution purposes. Although the same word "toro" appears in both marks, we do not see the marks as being "essentially the same." Applicant's mark adds non-

64

trivial features, including the letters "MR' and the design of a

bull's head, which somewhat change the look and sound of the mark. Also, applicant's mark may have a different, alternative meaning because there is evidence that applicant's mark may be suggestive of shape when used on thin film heads, which is different from the meaning or suggestive connotation of opposer's mark. Because similarity for likelihood of confusion purposes is not the test here and because we do not resolve doubts in favor of a party claiming dilution, we conclude that this factor does not favor opposer.

Second, we consider the renown of opposer's mark. As we discussed in the preceding section, opposer has not established that its mark is famous and distinctive. Again, based on the evidence of record, we cannot say that opposer has shown that the public in general associates the term "Toro" with opposer to the point that it is now a mark with a singular identification even when it is considered separate from the goods and services with which it is associated.

Even if the mark were famous, there is still the final key factor: whether target customers are likely to associate two different products with the mark, even if

65

they are not confused as to the different origins of these products. Hasbro, 66 F. Supp.2d at 136, 52 USPQ2d at 1417. For example, the legislative history indicates that the use of the mark BUICK for aspirin would be actionable even though purchasers of aspirin would be fairly confident that the automobile manufacturer did not suddenly enter the pain reliever market. However, the mark would be diluted because customers would wonder why another party could use a mark that they thought would have identified a unique, singular, or particular source. To show that a mark is more than a simple trademark, there must be some evidence that the potential purchasers link the two marks in their minds even if it is simply to speculate as to why the other party should be able to use the famous mark of another. "Dilution theory presumes some kind of mental association in the reasonable buyer's mind." Mead Data, 875 F.2d at 1031, 10 USPQ2d at 1966, quoting, 2 McCarthy § 24.13. We have no evidence on which to conclude that potential buyers of applicant's goods would make any association between the parties' marks when used on their respective goods and services.[20]

---

[20] As both the legislative history and the case law make it clear, dilution can occur between unrelated products regardless of whether there is a likelihood of confusion. However, courts have observed that "the closer the products are to one another [in the marketplace], the greater the likelihood of both

Accordingly, opposer has not demonstrated that registration of applicant's mark will dilute its TORO mark.

## Conclusion

With respect to the ground of dilution, opposer has not submitted sufficient evidence to support a finding that its TORO marks are famous for purposes of the FTDA. In addition, we find that even if the marks are famous, there is insufficient evidence to support a finding that applicant's mark would dilute opposer's marks. With respect to the ground of likelihood of confusion, our analysis under the traditional du Pont factors convinces us that there is no likelihood of confusion between the marks.

DECISION: The opposition to the registration of applicant's mark is dismissed.

---

confusion and dilution." Las Vegas Sports News, 212 F.3d at 164, 54 USPQ2d at 1581, quoting, Nabisco Brands, 191 F.3d at 222, 51 USPQ2d at 1882.